**In the Matter of Norman
L. STENTZ, Debtor.**

**Howard W. STENTZ, Personal
Representative for Howard L.
Stentz Estate, Plaintiff,**

v.

**Norman L. STENTZ, Defendant.**

Bankruptcy No. BK94–41441.
Adv. No. A95–4033.

United States Bankruptcy Court,
D. Nebraska.

May 30, 1996.

Joseph H. Badami, Chapter 7 Trustee, Lincoln, NE.

## MEMORANDUM

JOHN C. MINAHAN, Jr., Bankruptcy Judge.

This case is brought by debtor's brother, as Personal Representative of his father's estate, to establish a nondischargeable claim for debtor's depletion of his father's assets. The claim of the Estate of Howard L. Stentz is allowed in the amount of $33,253.86. Of that amount, $33,053.86 is excepted from discharge.

## FACTS

Howard L. Stentz died February 26, 1992, at the age of 92. He was survived by two sons, Norman L. Stentz, the Chapter 7 debtor and defendant herein, and Howard W. Stentz ("Buster Stentz"). Buster Stentz brought this action in his capacity as Personal Representative of the Estate of Howard L. Stentz. Plaintiff alleges that Norman improperly converted funds and property belonging to Howard L. Stentz prior to and after Howard's death. Plaintiff originally filed an action in state court against Norman for an accounting and turnover of funds. That case was transferred to this court after Norman filed a Chapter 7 bankruptcy case on December 29, 1994, and has proceeded to trial in this adversary proceeding.

Buster Stentz had a good relationship with his parents, but lived a great distance away as an adult. Norman lived in Lincoln, Nebraska, near his father, and had a very close relationship with his father. Norman began working with his father as a small boy and eventually worked with him as an adult. Norman and Howard were union electricians and often worked together on construction sites. In addition, both served in the United States Navy and, for a period, served at the same time. Both were active members in the Union Local International Brotherhood of Electrical Workers ("IBEW") and the American Legion, and often attended functions together.

Daniel E. Wherry and Stephen D. Mossman, Mattson, Ricketts, Davies, Stewart & Calkins, Lincoln, NE, for Howard W. Stentz, Plaintiff.

Robert M. O'Gara and Paul J. Peter, Bruckner, O'Gara, Keating, Hendry, Davis & Nedved, P.C., Lincoln, NE, for Norman L. Stentz, Defendant.

**970**

After Howard's wife died in 1981, Norman assumed more responsibility for the care of his father. Initially, Norman primarily provided companionship. Norman monitored his father's living conditions and health, and Norman frequently visited his father and invited him to dinner. Howard attempted to commit suicide in 1990, and thereafter required more attention and assistance in daily living. Howard moved into Norman's home in July, 1990, and Norman and his family took over many areas of Howard's day to day care, such as meal preparation, laundry, and transportation. From late July, 1990, to March 5, 1991, Howard lived with Norman's family between hospital stays. On March 5, 1991, after his second suicide attempt, Howard entered a veterans care facility in Grand Island, Nebraska, where he remained until his death in February, 1992.

On January 30, 1989, Howard L. Stentz executed a Durable Power of Attorney ("Power of Attorney") granting Norman very broad powers over Howard's financial affairs.[1] The Power of Attorney contained no authority to make gifts on Howard's behalf. Roy Sheaf, the long time friend and attorney for Howard L. Stentz, testified respecting the Power of Attorney. Sheaf explained to Howard the function of a Power of Attorney, and Howard directed that it be prepared. The request to prepare the Power of Attorney was a voluntary act of Howard, with no intervention by Norman. "Howard always came to me on his own" was Sheaf's recollection. Howard was competent at all times he visited Sheaf's office. Sheaf did not discuss the Power of Attorney with Norman, nor did he instruct Norman about his authority and responsibility under the Power of Attorney. I conclude that the Power of Attorney was prepared solely at Howard's request. Based on Norman's testimony, I conclude that Norman understood that the Power of Attorney was to be used if something happened to Howard, or if Howard became incompetent.

Between 1986 and 1992, a number of transactions took place which disposed of the bulk of Howard L. Stentz's assets. The first transaction occurred in 1986, when Howard L. Stentz transferred to Norman $2,000.00 from a Share Certificate ("CD" or "Certificate of Deposit") issued by the Local # 265 IBEW Federal Credit Union (the "Credit Union"). On January 17, 1990, an additional $10,000.00 in CDs were transferred to Norman. On February 21, 1990, Howard closed his savings account at the Credit Union, and transferred the $3,964.57 balance to Norman. Two remaining CDs, in the amount of $5,000.00 each, were transferred to Norman on March 8, 1990, and March 27, 1990. Plaintiff asserts that these transactions were the result of undue influences, conversion, fraud or defalcation as a fiduciary.

In July 1990, Howard gave Norman signature authority on his checking account at the Havelock State Bank (the "joint account"). Norman's name was added to the joint account solely on the request of Howard. Norman had no knowledge that his own name was added to the account until after it was done. Social Security benefits, interest payments, and dividends belonging to Howard were deposited into the joint account until Howard's death. Norman began writing checks on the joint account around July 30, 1990.

The signature card on the joint account and documents showing the terms of the signature authority granted Norman were not introduced into evidence. There is no evidence of Howard's actual intent in adding Norman as a signatory to the joint account. However, it is clear that this account was a joint account under Nebraska law and that both Howard and Norman had signature authority over the account. There is no evidence that the Power of Attorney was ever used in connection with the joint account,

---

1. The Power of Attorney granted Norman the authority to receive payments and property, settle accounts, satisfy security interests and mortgages, prosecute, defend and settle disputes, manage, sell, lease or exchange real estate, receive rents, execute deeds, sell or exchange personal property, invest, deposit, or withdraw funds, vote at shareholder meetings and execute proxies, execute bills, notes and checks, and to do any act necessary in connection with the exercise of these powers for the benefit of Howard L. Stentz.

except in making a deposit of the proceeds of real estate sold under the Power of Attorney.

Howard owed a home and adjacent city lots, described as Lots 2, 3, 4 and 5 of Block 161 Havelock, in Lincoln, Nebraska, as well as personal property in the home. After Howard's health deteriorated in July of 1990, he moved in with Norman. The bulk of Howard's personal property located in the Havelock home was then disposed of through gifts to family members and charitable organizations, and by disposal at the city dump. The house and adjoining lots were subsequently sold. Howard signed documents to sell Lot 2, and Norman duly used the Power of Attorney to sell Lots 3, 4 and 5. The net proceeds from the sale of the home and Lots 3, 4 and 5 totalled $49,041.14, and these funds were deposited into the joint account in November and December, 1990. In February, 1991, at Howard's direction, Norman wrote checks from the joint account as follows: $9,750.00 to Buster (Check No. 634, dated February 11, 1991); $9,750.00 to Norman (Check No. 640, dated February 12, 1991); and $9,700.00 to Marjorie Stentz (Norman's wife) (Check No. 641, dated February 13, 1991).

In July, 1990, after his name was added to Howard's account, Norman began using the joint account as his personal checking account. Norman withdrew funds for personal use and deposited personal funds into the account. Norman asserts that he had a right to withdraw funds for personal use up to the amount of his personal deposits. Norman argues that all other withdrawals from the joint account were made at his father's direction, or with his knowledge and approval, or were made for the direct benefit of his father.

Approximately $103,922.32 was withdrawn from the joint account between July 30, 1990, and Howard's death on February 26, 1992. Plaintiff admits that $3,177.39 of these withdrawals directly benefitted Howard. Plaintiff asserts that the remainder of the withdrawals were unauthorized gifts or personal expenditures by Norman. Norman admits liability for many personal expenditures he made with Howard's money from the joint account. But, Norman asserts that he has no liability for over $60,000.00 in withdrawals he made from the joint account. Norman asserts that these withdrawals were for Howard's benefit or at Howard's direction.

After Howard's death, Norman converted to personal use a veterans death benefit and a partial refund of Howard's prepaid funeral services.

After Norman refused to probate his father's estate, Buster Stentz was named Executor and Personal Representative of the Howard L. Stentz Estate on November 30, 1993. Buster claims that Norman made improper transfers of funds of Howard L. Stentz and that transfers made by Howard were the product of undue influence exercised over Howard by Norman. The Complaint requests an accounting and alleges in Count I that Norman took advantage of a special relationship with his father in obtaining and converting his father's funds to his personal use. The Complaint also alleges that Norman refused and failed to account for his acts as receiver, bailiff, fiduciary on the Power of Attorney, and his refusal to probate his father's estate, and that Norman's acts were done with a fraudulent intent, under false pretenses or false representations or actual fraud. In addition, the Complaint alleges that because Norman's fiduciary capacity allowed him to obtain and convert his father's property, Norman's acts constituted actual fraud or defalcation by a fiduciary, embezzlement, larceny or conversion. Plaintiff alleges that as a result, the court should find its claim to be nondischargeable under Bankruptcy Code § 523(a)(2)(A) and (a)(4). Count II alleges that Howard's transfer of funds on deposit at the IBEW Credit Union to Norman was the product of undue influence.

## DISCUSSION

The court must determine the amount of the allowed claim held by the Howard L. Stentz Estate against the debtor and whether the claim is excepted from discharge under Bankruptcy Code § 523.

## I. ALLOWED CLAIMS

■ The claims against Norman held by Howard L. Stentz at the time of death are vested in the Probate Estate. Under Nebraska law, I conclude that Norman is liable to the Howard L. Stentz Estate in the amount of $33,253.86.

## A. IBEW CREDIT UNION DEPOSITS

■ Howard L. Stentz transferred $25,964.57 he held on deposit at the IBEW Credit Union to Norman.

| DATE | AMOUNT | SOURCE | NATURE OF TRANSFER |
|---|---|---|---|
| 10/24/86 | $ 2,000.00 | Howard's CD | A $3,000.00 CD was cashed. $1,000.00 was deposited into Howard's account, and $2,000.00 was deposited into Norman Stentz's account. |
| 01/17/90 | $10,000.00 | Howard's CD | $10,000.00 CD "rewritten in Norman's name at request of Howard L. Stentz." |
| 02/21/90 | $ 3,964.57 | Savings | Savings account closed—$3,964.57 transferred into Norman's account at Credit Union. Journal voucher signed by Howard L. Stentz. |
| 03/08/90 | $ 5,000.00 | Howard's CD | $5,000.00 CD rewritten in Norman's name at the request of Howard L. Stentz. |
| 03/27/90 | $ 5,000.00 | Howard's CD | $5,000.00 CD transferred to Norman's name at the request of Howard L. Stentz. |

Mr. Les Lothe, the manager at the IBEW Credit Union testified that he knew Howard personally, having visited with Howard numerous times over the years. On occasion, Howard stopped by the Credit Union for coffee after participating in American Legion funerals. Mr. Lothe testified Howard was competent during each of the above-described transactions, and each was done solely at Howard's direction.

Each Certificate of Deposit contains contemporaneous notations by Mr. Lothe regarding the disposition of the proceeds. The $5,000.00 Certificate of Deposit which matured on March 8, 1990, contains the handwritten notation by Mr. Lothe that it was rewritten "in the name of Norman L. Stentz at the request of Howard L. Stentz." A similar notation occurs on the $5,000.00 Certificate of Deposit which matured March 27, 1990, and the $10,000.00 Certificate of Deposit which matured January 17, 1990.

Mr. Lothe testified that Norman was not present when these transactions occurred, with the exception of the visit on February 21, 1990, when Howard closed his savings account at the Credit Union. On that visit, Norman tried to *dissuade* Howard from closing his account, because once the account was closed, Howard would no longer be a member of the Credit Union. Mr. Lothe recalled that Howard's mental condition during the February, 1990, visit was not quite as cheerful and Howard appeared more business-like as compared to prior visits, but otherwise he seemed about the same.

Howard was mentally competent during the period of time when the Credit Union transfers occurred. Howard was still living independently and was capable of making independent decisions concerning his affairs. Howard's decisions concerning the Credit Union deposits were made independently and in a clear state of mind. No evidence has been presented by plaintiff to the contrary. Norman did not direct that these transfers be made. I conclude that Howard made these transfers of his own volition, that the transfers constituted gifts to Norman, and that, in fact, Norman did not exert any influence on his father to make the transfers.

■ Among the elements required to establish a prima facie case of undue influ-

ence, the plaintiff must show by clear and convincing evidence that the grantor's mental state was such as to be subject to influence. Undue influence cannot be implied based solely on a seemingly inequitable result. Rather, plaintiff has the burden of presenting evidence showing Howard's mental condition was such that he was subject to the influence of the defendant. *See Schaneman v. Schaneman,* 206 Neb. 113, 291 N.W.2d 412, 420 (1980); *Biggerstaff v. Ostrand,* 199 Neb. 808, 261 N.W.2d 750, 754 (1978) (stating that, as a general rule, a conveyance is valid if it appears that the grantor acted voluntarily, deliberately, and advisedly, with full knowledge of the nature and effect of his act, and not because of the influence of a confidential relationship). I conclude that plaintiff has not met this burden.

Norman has no liability to the plaintiff respecting the transfer of the IBEW Credit Union deposits.

## B. *LOTS 2, 3, 4 AND 5*

■ Lot 2 was sold on January 13, 1989. The deed was personally signed by Howard. Howard received net proceeds of $5,539.29. He deposited these funds in the joint account on January 19, 1989. Norman has no liability respecting the sale of Lot 2. The question of Norman's liability for disposition of Howard's funds deposited in the joint account is discussed in detail below.

Lot 3 was sold on October 31, 1990. Norman duly signed Howard's name on the deed under authority of the Power of Attorney. The net proceeds received on Lot 3 total $7,977.30. These funds were deposited by Norman in the joint account on November 1, 1990. This transaction occurred three months after Norman obtained signature authority over the joint account.

Lots 4 and 5 (Howard's home) were sold November 25, 1990. Norman duly signed Howard's name on the deed under authority of the Power of Attorney. The net proceeds of $41,063.84 were deposited by Norman in the joint account on December 6, 1990.

The sale of Lots 3, 4 and 5 were within the scope of Norman's authority under the Power of Attorney. These lots were duly sold without irregularity, and Norman appropriately deposited the net proceeds of the sales into the joint account.

Norman has no liability from the sale of Lots 3, 4 and 5. The question of Norman's liability for disposition of sale proceeds deposited in the joint account is discussed below.

## C. *PERSONAL PROPERTY FROM HOWARD'S RESIDENCE*

■ Plaintiff also claims Norman converted or misappropriated furnishings, household effects, and other personal property from Howard's residence while preparing the house for sale. While I recognize that many of the items which were disposed of may have had sentimental value to Stentz family members, plaintiff has not established an allowed claim arising from disposition of personal property by Norman.

After his first suicide attempt, Howard resided with Norman, and Norman prepared Howard's house for sale. This was a family in crisis, dealing immediately with the suicide attempt, hospitalization, and illness of Howard. Norman and his family faced issues concerning Howard's care and moving Howard into Norman's home, and preparing comfortable living quarters for him there. Later, Norman's family took on the task of preparing Howard's house for sale. It was necessary to empty the house, dispose of the contents and clean it up. This was a monumental job. Howard and his family spent many long exhausting days of hard labor cleaning, repairing and clearing out the home and garage for sale. Howard had lived alone for several years and the condition of the house and garage had greatly deteriorated over time. There were stacks of old mail, magazines and newspapers, trash, dirty dishes, and dust and grime throughout the house. The garage was full of old tools, tires, oil containers, and dirt covered the floor. It would have been appropriate for Norman to hire workers at Howard's expense to clean, repair, and prepare the house for sale. Instead, Norman and his family undertook the effort, saving Howard money and speeding the sale.

Buster recalls many assets which his parents owned, and he has raised questions about what happened to this property. Before July, 1990, Howard disposed of many of his assets, including many of the assets which Buster recalls. Howard gave items to neighbors, family, and his close friend, Gladys Riner. For example, two living room chairs were given to Gladys Riner. Other items were transferred to various family members at the time Howard's home was prepared for sale. Howard directed that items not wanted by family members were to be given to DAV or Goodwill. The condition of much personal property had deteriorated to such a degree that it was of little or no monetary value, and it was appropriately hauled to the dump. As discussed below, Norman did sell some of Howard's personal property and retained the proceeds. Norman is liable for the amount of these sale proceeds.

The refrigerator, clothes washer, and dryer, were all in poor condition. These items, as well as the dining room set, were sold with the house. Clothes which were not given to various granddaughters were donated to Goodwill or thrown away. A broken television was also given to Goodwill. Other items were taken to the dump, such as the stove, twin beds, a piano from the basement, a freezer, window air conditioner, a basement chair, mattress, and a chest of drawers. These items were of no value. Indeed, truckload after truckload was appropriately taken to the dump and thrown away.

There was no antique clock or candelabra at the house, as Buster asserts. A buffet and dressing table were given by Howard to his granddaughter, Debbie Hazen, (Norman's daughter). She also received a white painted buffet, an old dressing table, and a few pieces of china that belonged to her grandmother. She later sold the buffet and dressing table for $45.00 and $50.00, respectively. These were valid gifts at the direction of Howard L. Stentz, and Norman has no liability respecting these transfers to Debbie Hazen.

A china closet, an end table, and a chest of drawers were given by Howard L. Stentz to his granddaughter, Jane Stentz, (Norman's daughter). Jane was living with her father,

Norman, at this time, and helped move Howard to Norman's house. Jane Stentz put this furniture in the family room in the basement at Norman's home, and Howard saw the furniture there. Later she moved to a small apartment and sold the china closet at a garage sale for less than $100.00. These were valid gifts at the direction of Howard and no liability should be assessed against Norman on these items.

A writing desk was given to Tracie Brinkman, and blue drinking glasses were given to Kim Duble and Barbara Haber. Liability should not be assessed against Norman on these items.

I again emphasize my fact finding that Howard had directed that items not wanted by family members should be given to the DAV or Goodwill. By this directive, Howard had consented to family members taking items they wanted. Norman did not effectuate these gifts under authority of the Power of Attorney. These were gifts made directly by Howard.

Norman admits that he did sell several items from the residence and received at least $200.00. He has not accounted for the money. Norman is liable in the amount of $200.00 for the proceeds from these sales. I think there is a valid distinction between Norman keeping an item of Howard's property for his own use, which would have been appropriate, and Norman selling an item and keeping the money. The proceeds should have been deposited in the joint account for Howard's benefit.

### D. FUNERAL–RELATED FUNDS

During his lifetime, Howard made his own funeral arrangements and prepaid for them. Howard had been involved with the American Legion funeral honor guard for many, many years. One can surmise that Howard knew exactly what funeral arrangements he wanted. Nevertheless, after Howard died, Norman cancelled the pre-arranged funeral plans and selected a lower cost funeral. Norman received and retained a refund of the $5,053.72 which Howard had prepaid on a funeral contract. Norman deposited this money in the joint account. Norman

paid $3,706.80 in funeral expenses from the joint account as follows: $3,206.80 to Lincoln Memorial Funeral Home; $400.00 to Wyuka Cemetery; and $100.00 to Minister Maurice Champion–Garthe. The refund balance, $1,356.92, was retained by Norman. After Howard died, Norman also received a $450.00 burial benefit from Veterans Affairs, and Norman retained these funds.

The funeral contract refund and the Veterans Affairs burial benefit are property of the Howard's Probate Estate. Therefore, plaintiff has an allowed claim against Norman in the amount of $1,806.92. This claim arose after Howard's death and is not duplicative of plaintiff's claims for Norman's unauthorized use of funds in the joint bank account before Howard's death.

## E. *JOINT BANK ACCOUNT*

■ When Howard gave Norman signature authority over his bank account on July 30, 1990, the account became a joint account. Counsel elected not to make the bank documents concerning the terms of this account a part of the record. However, it is acknowledged by both parties that after July 30, 1990, both Howard and Norman had authority to withdraw funds from the joint account and that upon Howard's death the funds in the account were owned by Norman. There is no evidence that this was a trust account.

The ownership interests of the parties to the joint bank account were governed by Nebraska statutory laws in effect during the time period relevant to this case.

**30–2703. Ownership during lifetime.**
(a) A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent.

NEB.REV.STAT. § 30–2703 (Reissue 1989) (repealed 1993).

The official comments to section 30–2703 state that this provision "does not undertake

to describe the situation between parties if one withdraws more than he is then entitled to as against the other party.... Presumably, overwithdrawal leaves the party making the excessive withdrawal liable to the beneficial owner as a debtor or trustee." Further, the comments indicate that courts would undoubtedly "divide the account equally among the parties to the extent that net contributions cannot be proven." § 30–2703 cmt.

"Net contribution" is defined as follows:

(6) Net contribution of a party [2] to a joint account as of any given time is the sum of all deposits thereto made by him or for him, less all withdrawals made *by or for him which have not been paid to or applied to the use of any other party,* plus a pro rata share of any interest or dividends included in the current balance.

NEB.REV.STAT. § 30–2701(6) (Reissue 1989) (repealed 1993) (emphasis added).

The official comments to section 30–2703 also state that the nature of ownership of funds in a joint account is not in the nature of a present joint tenancy. However, the statute provides for a disposition at death that is similar to joint tenancy, vesting ownership in the co-depositor. Section 30–2704 states, in relevant part, that:

(a) Sums remaining on deposit at the death of a party to a joint account belong to the surviving party or parties as against the estate of the decedent unless there is clear and convincing evidence of a different intention at the time the account is created.

. . . .

(e) A right of survivorship arising from the express terms of the account or under this section ... cannot be changed by will.

NEB.REV.STAT. § 30–2704 (Reissue 1989) (repealed 1993).

The evidence does not establish the actual intentions of Howard at the time he gave Norman signature authority over this bank account. With no "clear and convincing evi-

---

**2.** Party means "a person who, by the terms of the account, has a present right, subject to request, to payment from a multiple-party account.... Unless the context otherwise requires, it includes a guardian, conservator, personal representative, or assignee, ... of a party." NEB REV STAT. § 30–2701(7) (Reissue 1989) (repealed 1993).

dence of a different intention," I conclude that during the lifetime of Howard, funds in the joint account were owned by Howard and Norman in proportion to their net contribution, and that upon Howard's death the funds remaining in the joint account belonged to Norman as the surviving co-depositor. Only $446.89 remained in the account when Howard died and these funds belong to Norman.

During Howard's lifetime, Norman withdrew funds from the joint account in excess of Norman's proportional ownership as determined by a statutory net contribution analysis. Howard's claim against Norman for excess withdrawals passed to Howard's estate upon his death. As a matter of law, this claim was not extinguished upon Howard's death. *Cf. Shourek v. Stirling*, 621 N.E.2d 1107, 1110 (Ind.1993) (holding that the presumption that funds in a joint account belong to the survivor at death of co-depositor does not apply where funds were withdrawn prior to death of co-depositor). The amount of the Probate Estate's claim is equal to Howard's "net contribution" to the joint account, minus the amount remaining in the account on the date of his death. Howard's "net contribution" to the account is determined by statutory definition and is calculated as the sum of all deposits made by him or for him, less *all withdrawals made by or for him which have not been paid to or applied to the use of any other party*. § 30–2701(6).

*Deposits*

Howard had $11,135.88 in the joint account on July 30, 1990, before Norman began writing checks on the account. Between July 30, 1990, and February 26, 1992, the date of Howard's death, an additional $70,859.62 of Howard's money was deposited into the account from a variety of sources. These deposits are summarized as follows.

| Source | Amount of Deposit |
| --- | --- |
| Social Security | $17,042.40 |
| IBEW & NECA | $ 4,776.08 |
| Sale of Lot 3 | $ 7,977.30 |
| Sale of Lots 4 and 5 | $41,063.84 |
| Total | $70,859.62 |

In addition, interest was paid on the joint account monthly, and a total of $709.47 in interest was credited to the joint account for the period beginning with the July, 1990, statement through the February, 1992, statement. Neither party has proven the amount of interest to be attributed to Howard or Norman's share of the joint account. Guided by the official comments to section 30–2703, I conclude that the interest credited to the joint account should be divided equally among the parties because there is a failure of proof as to whose funds were on deposit during the periods of interest accrual. Howard will be credited with one-half of the interest, or $354.73 in the calculation of his net contributions to the joint account under section 30–2703.

During the period of time in which Norman had signature authority on the joint bank account there was, in aggregate, $82,-350.23 of Howard's money in the account *(the $11,135.88 balance, plus $70,859.62 in deposits, and $354.73 interest)*. At the time of Howard's death there was a $446.89 balance in the joint account which passed to Norman by right of survivorship. The plaintiff acknowledges that a total of $7,184.19 was withdrawn from the account by Howard, or for his benefit by Norman. Of the $7,184.19, $3,177.39 was withdrawn during Howard's lifetime. The amount in controversy is $78,-707.95 *($82,350.23 minus $464.89 minus $3,177.39)*.[3] The $78.707.95 represents How-

**3.** Exhibit 64 lists all withdrawals from the joint account between July 30, 1990, and March 24, 1992. Plaintiff acknowledges that $7,184.19 of these withdrawals were made by Howard, at Howard's direction, or were for Howard's benefit. Of these withdrawals, $3,177.39 were made prior to Howard's death on February 26, 1996, (Check Nos. 488, 489, 491–494, 500, 502, 508, 509, 514–517, 521, 523, 533, 545, 547, 526, 564, 588, 591, 527, 603, 620, 644, 660, 688, 742, 747, 758, 790, 796, and automatic withdrawals totalling $217.94).

Debtor acknowledged withdrawals totalling $34,825.36 were for debtor's own personal benefit (Check Nos. 519, 528, 536, 537, 538, 540, 541, 542, 546, 550, 551, 553, 554, 555, 557, 558, 562, 565, 568, 570, 572, 578, 580, 586, 587, 590, 595–598, 601, 602, 605, 606, 607, 609, 611, 612, 613, 616, 618, 619, 621, 622, 624, 625, 626, 632, 636, 638, 639, 645, 648, 651, 652, 655–658, 661–665, 667, 668, 670–673, 675–679, 681, 683, 684, 686, 689, 690, 691, 693, 694, 696–699, 701–704, 706–717, 719–725, 727–731, 733–740, 743–746, 748–

ard's funds in the joint account which were withdrawn by Norman during Howard's life. The plaintiff contends that Norman is liable to Howard's estate for $78,707.95 on the theory that it was Howard's money and Norman disposed of it without authority. Norman has the burden of coming forward with an accounting, and he has identified particular withdrawals from the joint account which he contends were at Howard's direction or for Howard's benefit. To the extent that the $78,707.95 was not spent at Howard's direction, or for Howard's benefit, Norman is liable to Howard's Probate Estate.

*Disbursements*

Discussed below are each of the contested withdrawals from the joint account. In each case, Norman asserts that the disbursement was either at Howard's direction or for Howard's benefit. The plaintiff objects to each.

*Cleaning Howard's Home.* Norman testified that $5,413.81 worth of checks were drawn on the joint account in connection with cleaning Howard's home, as follows.

| Check No. | Date | Amount | Designation/Testimony |
|---|---|---|---|
| 487 | 07/30/90 | $1,600.00 | August Expense-for house expenses |
| 490 | 08/25/90 | $ 100.00 | Cash-for house expenses |
| 495 | 09/02/90 | $ 132.81 | Groceries used at house |
| 497 | 09/11/90 | $ 200.00 | Cash-for expenses |
| 498 | 09/15/90 | $ 114.29 | Groceries used at house |
| 499 | 09/18/90 | $ 200.00 | Cash expenses |
| 506 | 10/12/90 | $ 200.00 | Cash expenses |
| 511 | 10/19/90 | $ 200.00 | Cash expenses-misc. on house |
| 513 | 10/28/90 | $ 10.26 | Journal Star Newspaper advertisement-selling house items |
| 529 | 11/08/90 | $ 200.00 | "Norm Compensation" |
| 532 | 11/16/90 | $ 300.00 | "Cash Expenses" |
| 549 | 11/30/90 | $ 450.00 | "Cash for Expenses" |
| 559 | 12/08/90 | $ 725.00 | Havelock Motors: truck for Tom |
| 566 | 12/14/90 | $ 300.00 | Duane Rathjen: Pickup for Tom |
| 685 | 05/08/91 | $ 681.45 | Purchase mower to replace one burned up while working on house |

Total $5,413.81

As previously discussed, Norman and his family cleaned Howard's home in preparation for its sale. Norman testified that he spent funds from the joint account, as evidenced by the above checks, during this time for various purposes related to his father, including repairs and supplies for Howard's residence, and groceries and meals on days spent at the house. However, the debtor's testimony as to Check Nos. 490, 495, 497, 498, 499, 506, 511, 529, 532 and 549 is characterized by an inability to explain the particular purpose for these withdrawals totalling $2,097.10. Debtor testified that he did not have a good memory and did not keep books or records for these expenditures. The $2,097.10 in withdrawals are not treated as for Howard's benefit.

The debtor used the $1,600.00 in funds obtained by Check No. 487 on initial expenditures for repairs and cleaning expenses at Howard's residence. Debtor rented a floor scrubber, carpet cleaner, and a construction dumpster, installed a new toilet, and replaced window air conditioners. He purchased supplies for cleaning and repairing fixtures, windows and blinds, painting, and yard work. Fees were paid at the city landfill for dumping truckloads of trash, appliances and tires, and debtor purchased fuel for the pickup used for hauling. Debtor purchased food for those helping clean at the house. These expenditures were for Howard's benefit.

Norman's son, Tom Stentz, used his own pickup truck to help haul trash from Howard's home to the dump. When Tom's truck broke down, Norman purchased a used pickup truck for Tom at a cost of $725.00 drawn from the joint account by Check No. 559. The pickup purchased for Tom broke down shortly after purchase. Norman then purchased a 1969 Plymouth for $300.00 from the joint account, so that Tom would have transportation for work. Both of these vehicles were purchased by Norman after Howard's house was sold. The evidence does not establish that Howard directed Norman to purchase these two vehicles. There was a temporary need for a vehicle while preparing Howard's home for sale. Norman could have rented a truck or compensated Tom Stentz for the use of Tom's pickup and the expense would have been treated as a benefit to Howard. Although the purchase of two vehi-

757, 759, 760, 762–770, 772–775, 777–787, 789, 791–795, 797, 799, 800, and 803–811).

The dispute involves the remaining checks listed on the Exhibit 64, each of which is discussed *infra.*

cles for Tom was of incidental benefit to Howard, I conclude that the purchase was not of sufficient benefit to Howard for the expense to be charged to Howard. The purchase of the two vehicles, for a total of $1,025.00, is not properly treated as for Howard's benefit.

Norman's walk-behind Lawn Boy mower was used at Howard's residence and lots and was damaged. Howard authorized and directed that a replacement lawnmower be purchased for Norman. Norman subsequently purchased a Troy-built self-propelled type mower for $681.45. This amount is treated as a withdrawal from the joint bank account at Howard's direction.

Norman's withdrawal of $2,291.71 (*$1,600.00 plus $10.26 plus $681.45*) from the joint account for cleaning up Howard's home, or as directed by Howard is properly treated as for Howard's benefit. The other, above itemized checks were not written for Howard's benefit or at Howard's direction.

*Howard's Living Expenses at Norman's Home.* A number of disbursements from the joint account relate to Howard's care and comfort while living in Norman's home. Norman asserts that all of these withdrawals from the joint account were for Howard's benefit.

Sheryl Shuster provided domestic services at Norman's home during the time Howard resided with Norman. Shuster did Howard's laundry, cleaned up his room, cooked for him, and performed other tasks. Norman claims he disbursed a total of $1,747.00 from the joint account for Shuster's services relating to Howard's care. (Check Nos. 501, 505, 507, 510, 512, 522, 530, 543, 548, 567, 585 and 594.) Shuster also provided services to Norman's family and Norman paid $2,590.00 to Shuster for services performed during the time Howard resided at Norman's home. Norman allocates approximately 67%, or $1,747.00 of this $2,590.00, to Howard's care, and I conclude that this allocation fairly represents the amount by which Howard benefitted from Shuster's services. The amount of $1,747.00 was withdrawn from the joint account for Howard's benefit.

Between July, 1990, and February, 1991, when Howard resided with the debtor and his family, the debtor purchased special groceries and sundries for Howard, and Howard also consumed debtor's family groceries. Norman claims that $965.45 was spent from the joint account for Howard's groceries and sundries. Norman asserts that this amount represents only some of the groceries purchased by his family during the period his father resided with him. This $965.45 is an accurate and reasonable measure of the amount by which Howard benefitted. The checks which Norman allocates to these expenses are Check Nos. 503, 526, 531, 539, 552, 563, 571, 593, 604 and 627, and were written between September, 1990, and February 4, 1991. Considering this time period, and deducting the time Howard was hospitalized, I conclude that Howard resided with debtor for approximately 130 days prior to entering the Grand Island veterans home. The $965.45 amount debtor seeks to charge Howard for groceries averages approximately $7.42 per day while living in debtor's home. The $965.45 was withdrawn from the joint account for Howard's benefit.

Checks were drawn on the joint account by Norman for Howard's comfort and living expenses as follows.

| Check No. | Date | Amount | Designation/Testimony |
|---|---|---|---|
| 504 | 10/05/90 | $ 549.05 | White Electric (Electric Heaters) |
| 527 | 11/06/90 | $ 83.04 | Merchandise Mart (Recliner Chair) |
| 617 | 01/25/91 | $ 300.00 | Cash Expenses |
| 623 | 01/31/91 | $ 29.75 | National Enquirer (Subscription) |
| 629 | 02/07/91 | $ 300.00 | Cash Expenses |
| 633 | 02/09/91 | $1,000.00 | Cash Expenses |
| 643 | 02/14/91 | $1,000.00 | Cash Expenses |
| 669 | 04/01/91 | $ 206.85 | Thomas and Lietz Painting (Paint room after suicide attempt) |
| | Total | $3,468.69 | |

The recliner and electric heaters were purchased and used for Howard's comfort while residing with debtor. Check No. 504 paid the costs of installing a thermostat and baseboard heaters in Howard's bedroom. The recliner was purchased for Howard's use at a cost of $83.04. Howard requested the subscription to the *National Enquirer*, and Check No. 623 represents the payment for the subscription. These withdrawals from

the joint account were for the benefit of Howard.

In February of 1991, Howard attempted suicide in his room in debtor's home by cutting his throat and wrists. The walls in the room were stained by blood. The room required repainting at a cost of $206.85. This was an appropriate withdrawal from the joint account for Howard's benefit to pay for damages he caused.

Check Nos. 617, 629, 633 and 643, represent $2,600.00 in cash withdrawals from the joint account and Norman provided no evidence of the particular purposes for which this money was spent. Therefore, this $2,600.00 is not treated as a withdrawal for Howard's benefit. The $868.69 balance *($3,468.69 minus $2,600.00)* was withdrawn for Howard's benefit.

*Car Expenses.* Funds from the joint account were used by Norman to purchase, repair and operate two other vehicles.

| Check No. | Date | Amount | Designation/Testimony |
|---|---|---|---|
| 574 | 12/16/90 | $ 8,559.00 | Park Place Pontiac for 1985 Cadillac |
| 628 | 02/06/91 | $ 7,595.00 | Dean Bros. Lincoln Mercury for 1989 Town Car |
| | Total | $16,154.00 | |

Norman also drew a number of checks on the joint account to pay expenses related to the two vehicles.

| Check No. | Date | Amount | Designation/Testimony |
|---|---|---|---|
| 575 | 12/17/90 | $ 671.24 | Lancaster Co. Treasurer (License) |
| 576 | 12/17/90 | $ 386.62 | Capitol Tires |
| 577 | 12/18/90 | $ 155.28 | Midas Muffler |
| 584 | 12/21/90 | $ 690.00 | Towne Automotive |
| 589 | 02/24/91 | $ 175.41 | Pro Image (Tint) |
| 599 | 12/31/90 | $ 212.00 | Davidson Ins. (Cadillac) |
| 600 | 01/03/91 | $1,059.68 | Park Place repair (backed into street light) |
| 610 | 01/15/91 | $ 406.95 | Autographics: Paint after repairs |
| 631 | 02/08/91 | $ 452.13 | T.O. Haas Tire Co. |
| 649 | 02/23/91 | $ 233.25 | Auto Tint (Window Tint for Lincoln) |
| 682 | 05/02/91 | $ 653.81 | Dean Bros. (repair to Lincoln) |
| 687 | 05/11/91 | $ 153.36 | Ming Auto Beauty Center (Lincoln) |
| 718 | 07/21/91 | $ 95.53 | DIF Auto Parts (repairs for Lincoln) |
| | Total | $5,345.26 | |

Funds from the joint account were used by Norman to buy a 1985 Cadillac and to make various repairs on the car. This purchase was made at Howard's direction, and repairs were appropriately made on the 1985 Cadillac for Howard's benefit. Howard did not like the vehicle and complained extensively about it. Norman appropriately traded in the 1985 Cadillac on a 1989 Lincoln.

The Lincoln was purchased a few days before Howard's second suicide attempt. After the second suicide attempt, Howard did not reside in Norman's home. He went directly from the hospital to the veterans home in Grand Island. The Lincoln was appropriately retained by Norman for use in his transportation to Grand Island to visit Howard.

Norman spent a considerable amount of money on the repair and maintenance of the Lincoln. The costs associated with the acquisition of the Lincoln and the repair and maintenance of the Lincoln are appropriate expenses charged to the joint account for Norman's benefit.

Without any authority for so doing, Norman had titled the Lincoln in his own name and, after Howard's death, sold the car and retained the proceeds. Norman had no right to the Lincoln or its proceeds. Norman sold the Lincoln and received at least $12,000.00, which he retained and converted to personal use. Norman is liable to Howard's Probate Estate for $12,000.00. This liability arises after Howard's death and is in addition to Howard's liability on the joint account.

*Grand Island Visits.* Howard moved to the veterans home in Grand Island on March 5, 1991. Expenses were incurred by Norman in connection with his trips to Grand Island to visit Howard. Norman claims that the following expenses represent withdrawals from the joint account for Howard's benefit.

| Check No. | Date | Amount | Designation/Testimony |
|---|---|---|---|
| 654 | 03/05/91 | $ 255.00 | Cash for expenses, Open sundries account for Howard Stentz at GI ($55 deposit) meals and lodging for accompanying father to veterans home |
| 666 | 04/01/91 | $ 25.66 | Phillips 66 gas to Grand Island |
| 680 | 05/01/91 | $ 35.07 | Phillips 66 gas to Grand Island |
| 695 | 05/25/91 | $ 536.00 | Cash Expenses |
| 700 | 06/03/91 | $ 20.00 | Phillips 66 gas to Grand Island |

| Check No. | Date | Amount | Designation/Testimony |
|---|---|---|---|
| 726 | 08/01/91 | $ 16.22 | Phillips 66 gas to Grand Island |
| 741 | 08/03/91 | $ 78.95 | Phillips 66 gas to Grand Island |
| 776 | 11/29/91 | $ 30.52 | Phillips 66 gas to Grand Island |
| 788 | 01/03/92 | $ 39.97 | Phillips 66 gas to Grand Island |
| 798 | 01/31/92 | $ 12.48 | Phillips 66 gas to Grand Island |
| 802 | 02/12/92 | $ 200.00 | Cash expense for visit |

Total $1,249.87

The cost of Norman's trips to Grand Island benefitted Howard. These costs included funds spent on gas and the expenses paid with Check No. 654. Accordingly, the withdrawal of $513.87 (Check Nos. 654, 666, 680, 700, 726, 741, 776, 788, and 798) from the joint account is treated as for Howard's benefit.

Norman has not accounted for funds disbursed by Check Nos. 695 and 802. He can not identify the particular purpose for each withdrawal. Debtor testified that he did not have a good memory and did not keep books or records for these expenditures. Therefore, the $736.00 in withdrawals made with Check Nos. 695 and 802 are not treated as for Howard's benefit.

*Gifts.* Plaintiff claims that Norman used funds from the joint account to make several unauthorized gifts.

Debbie Hazen (f/k/a Debbie Young) is Norman's daughter. Hazen received four checks totalling $280.00 from the joint account. (Check Nos. 534, 556, 608, and 646.) The first three checks are for $50.00 each. She received one $50.00 check per month for three months. Hazen considered these checks as reimbursement for taking care of her grandfather. Hazen stated that these were payments for the errands, trips and transportation she provided for Howard. Hazen took her grandfather to the audiologist, podiatrist, and to the Veterans Hospital for checkups. She took him out for dinner and ice cream, and picked up his prescriptions at the pharmacy. One or two times a week she took Howard to see his girlfriend Gladys Riner. I conclude that checks totalling $280.00 written to Debbie Hazen were for Howard's benefit.

The following gifts were made at Howard's direction.

| Check No. | Date | Amount | Designation/Testimony |
|---|---|---|---|
| 496 | 09/05/90 | $ 500.00 | Marge Stentz-gift |
| 518 | 09/02/90 | $ 30.00 | Scottish Rite Temple dues for Norman |
| 520 | 10/28/90 | $ 45.00 | Shriner's dues for Norman |
| 544 | 11/25/90 | $ 204.43 | Hobby Town: Electric train for great-grandson |
| 560 | 12/09/90 | $ 235.63 | Pet Ark: Puppy for Janie |
| 561 | 12/10/90 | $ 150.00 | Terry Stentz: Christmas gift |
| 569 | 12/15/90 | $ 400.00 | Cash for Christmas gifts |
| 614 | 01/19/91 | $ 143.97 | Masterworks Framing Co.-Jane S. college diploma framing |
| 634 | 02/11/91 | $ 9,750.00 | Howard W. (Buster) Stentz |
| 637 | 02/11/91 | $ 366.00 | UNL–Tuition for Jane Stentz |
| 640 | 02/12/91 | $ 9,750.00 | Norman Stentz |
| 641 | 02/13/91 | $ 9,700.00 | Marjorie Stentz |
| 872 | 02/05/90 | $ 20.00 | Nebraska Society S.A.R.-signed by Howard L. Stentz |

Total $31,295.03

This $31,295.03 in withdrawals was made for Howard's benefit because the transfers were made by Howard, at Howard's specific direction, or with his approval.

Ironically, Norman is not being credited for paying $300.00 in expenses for Buster Stentz's son to attend Howard's funeral. This gift was made by Norman after Howard's death. At that time, the funds in the joint account belonged to Norman. Thus, Check No. 817 represents a gift by Norman to Buster's son, but it is not to be treated as a disbursement of Howard's funds for Howard's benefit.

*Summary as to Joint Account*

In summary, I conclude that funds were withdrawn from the joint account for the benefit of Howard, or at his direction, for the following purposes and amounts.

| Purpose | Amount |
|---|---|
| Howard's Home | $ 2,291.71 |
| Sheryl Shuster | $ 1,747.00 |
| Groceries | $ 965.45 |
| Living Quarters | $ 868.69 |
| Car Expenses | $21,499.26 |
| Trips to Grand Island | $ 513.87 |
| Debbie Young | $ 280.00 |
| Gifts | $31,295.03 |
| Total | $59,461.01 |

Of the $78,707.95 of Howard's funds in the joint account about which there is a dispute

as to disposition, $59,461.01 was withdrawn for the benefit of Howard, or at his direction. Norman withdrew the $19,246.94 balance *($78,707.95 minus $59,461.01)* for some other purpose and Norman is liable to Howard's estate in that amount. Excluding the $464.89 joint account balance at the time of Howard's death, the net contribution by Howard under Nebraska Revised Statute § 30–2701(6), is $19,246.94, and Norman wrongfully withdrew these funds.

## F.  CONCLUSIONS AS TO LIABILITY

Norman is liable to the Estate of Howard L. Stentz for $33,253.86, and the Probate Estate shall be allowed a claim in this case in that amount. This amount is the aggregate of Norman's liability for the following.

| Liability | Amount |
| --- | --- |
| Personal Property sold from Howard's Residence | $   200.00 |
| Amount Overdrawn from Joint Account | $19,246.94 |
| Lincoln Proceeds | $12,000.00 |
| Funeral Refund and Veterans Death Benefit | $ 1,806.92 |
| Total | $33,253.86 |

## II.  DISCHARGEABILITY OF THE ESTATE'S CLAIM

The Complaint asserts that the allowed claims of the Howard L. Stentz Estate arose from Norman Stentz having converted or obtained funds with fraudulent intent, false pretenses, false representations, actual fraud, or by fraud or defalcation while acting in a fiduciary capacity, embezzlement, larceny or conversion. This asserts a claim under Bankruptcy Code § 523(a)(2)(A) and (a)(4), which states that:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, [or] services, . . . to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud . . .

. . . .

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.

11 U.S.C. § 523(a).

▇▇▇ A discharge order in bankruptcy discharges the debtor from personal liability on all dischargeable debts. 11 U.S.C. § 727(a), (b). The debts excepted from discharge are set forth in Bankruptcy Code § 523. Exceptions to discharge are confined to those "plainly expressed" in the Bankruptcy Code, *In re Spencer,* 182 B.R. 263 (Bankr. E.D.Cal.1995), and these exceptions are narrowly construed in favor of the debtor. *See Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Werner v. Hofmann,* 5 F.3d 1170, 1172 (8th Cir.1993); 3 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 523.05A (15th ed. 1995) (citations omitted). Thus, a creditor opposing discharge of a debt must prove that the debt falls within an exception to discharge. *Werner,* at 1172.

▇▇▇ The issue of nondischargeability is a matter of federal law and is governed by the terms of the Bankruptcy Code. *Grogan v. Garner,* 498 U.S. 279, 284, 111 S.Ct. 654, 657–58, 112 L.Ed.2d 755 (1991). The standard of proof for dischargeability exceptions under 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard. *Id.* at 286, 111 S.Ct. at 659.

## A.  FALSE PRETENSES, FALSE REPRESENTATION OR ACTUAL FRAUD

▇▇▇ In determining whether a debt is excepted from discharge under section 523(a)(2)(A), the court must determine whether the claim arose from false representations, false pretenses or fraud. There is no evidence of false representations or false pretenses by debtor. The issue is whether the $33,253.86 debt arose from actual fraud. Under section 523(a)(2)(A), actual (or positive) fraud, rather than fraud implied in law, is required. 3 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 523.08[4] (15th ed. 1995). The concept of actual or positive fraud consists of something said, done, or omitted by a person with the design of perpetrating what he knows to be a cheat or deception. BLACK'S LAW DICTIONARY 595 (Special Deluxe 5th ed. 1968). It denotes some direct and active

operation of the mind, including any act of deceit, artifice, trick, design, and cases involving the intentional and successful employment of any cunning, deception, or artifice used to circumvent or cheat another. *Id.* There is no evidence of record from which I would conclude that Norman engaged in actual fraud. Norman's actions were not concealed and he used no deception, artifice or scheme to spend Howard's money. Norman acted in an open way, although he did not provide much information to Buster Stentz.

## B. *EXCEPTIONS UNDER SECTION 523(a)(4)*

Section 523(a)(4) excepts from discharge debts arising from (1) fraud or defalcation while debtor was acting in a fiduciary capacity; and (2) embezzlement or larceny whether or not acting in a fiduciary capacity. 3 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 523.14 (15th ed. 1995).

*Defalcation While Acting in a Fiduciary Capacity*

On the facts of this case, the issue is whether debtor acted with the requisite fiduciary capacity respecting disposition of his father's assets. The debtor held a durable Power of Attorney and signature authority over his father's bank account, and debtor acted for his father in the disposition of some of his father's assets.

■■■■ Whether a debtor acted with the requisite fiduciary capacity under section 523(a)(4) is a question of federal law. *See Ragsdale v. Haller,* 780 F.2d 794, 796 (9th Cir.1986). Under federal bankruptcy law it is a long established general rule that, to act in a fiduciary capacity, the debtor must act in a technical or "express trust" relationship. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934); *In re Long,* 774 F.2d 875, 878 (8th Cir.1985); *In re Stone,* 94 B.R. 298, 302 (S.D.N.Y.1988), *aff'd* 880 F.2d 1318 (2nd Cir.1989); *In re Cross,* 666 F.2d 873, 881 (5th Cir.1982); *In re Interstate Agency, Inc.,* 760 F.2d 121, 124 (6th Cir.1985); *Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir.1987); *Ragsdale,* at 796 (9th Cir.1986); *Quaif v. Johnson,* 4 F.3d 950, 953–954 (11th Cir.1993) (affirming district court). *See also In re Turner,* 134 B.R.

646, 653–56 (Bankr.N.D.Okla.1991) and cases cited therein. If a debtor acts as a trustee, holding legal title for a beneficiary pursuant to the terms of a written indenture of trust (a "formal trust"), it is clear that the debtor's actions in the capacity as trustee are with the fiduciary capacity required by section 523(a)(4). *See Klingman v. Levinson,* 831 F.2d 1292, 1295 (7th Cir.1987).

■■■■ I conclude, however, that the required fiduciary capacity exists in many situations other than in a formal trust relationship. Cases such as a recent decision of the Ninth Circuit Bankruptcy Appellant Panel exemplify the current line of cases which, on the one hand, read section 523(a)(4) as requiring a debtor to act as a formal trustee with the attendant bifurcation of legal and equitable title but, on the other hand, and in the face of difficult facts, conclude that a debtor not acting as a formal trustee nevertheless had the required section 523(a)(4) fiduciary capacity. *See In re Schneider,* 99 B.R. 974, 977 (9th Cir. BAP 1989); *see also In re Burgess,* 106 B.R. 612 (Bankr.D.Neb. 1989); *In re Turner,* 134 B.R. 646, 653–56 (Bankr.N.D.Okla.1991) and cases cited therein. I believe the tendency of judges, including myself in *In re Burgess,* has been to read the term "fiduciary capacity" to mean that the debtor must act as a trustee. This is an erroneous interpretation of section 523(a)(4).

■■■■ There are no specific words in section 523(a)(4) which limit its application to instances where a debtor acts as a trustee. The statutory requirement is merely that the debtor defalcated while acting in a fiduciary capacity. The Bankruptcy Code does not define the term "fiduciary capacity." However, its meaning is appropriately determined by reference to decisional law under the Bankruptcy Act which, like the current law, excepted from discharge certain obligations which arose from breach of fiduciary capacity. *See Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection,* 474 U.S. 494, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) ("bankruptcy statutes will not be deemed to have changed pre-Code law unless there is some indication that Congress thought that it was effecting such a change"); *United States*

*v. Ron Pair Enters., Inc.,* 489 U.S. 235, 239, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989) (limiting *Midlantic* solely to cases where the meaning of the Code is unclear on its face); *see also In re Snyder,* 101 B.R. 822, 835 (Bankr.D.Mass.1989) (applying *Midlantic* rule to define fiduciary capacity under section 523(a)(4)). A consideration of the Bankruptcy Act and related decisional law suggests that the required fiduciary capacity exists under section 523(a)(4) when a debtor acts as an executor, administrator, guardian or trustee, or in a comparable position of express trust.

The Bankruptcy Act of 1841 provided in Section One, that a bankruptcy debtor would not receive a discharge on a debt which arose from—

> defalcation as a public officer, or as executor, administrator, guardian, or trustee, or while acting in any other fiduciary capacity.

*Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 207, 11 L.Ed. 236 (1884).

In *Chapman,* the Supreme Court interpreted this statute by looking at the types of fiduciaries enumerated in it, and concluded the statute was intended to exclude implied trusts. Rather, the Court concluded, the fiduciaries enumerated in the statute were acting under special or technical trusts, and the term "other fiduciary capacity" was limited to those same types of trusts. *Id.* at 208. The issue in *Chapman* was whether a debt owed to a principal by a factor agent was dischargeable. The Court found that the factor's duty to hold funds in trust for the principal was not a fiduciary capacity under the Bankruptcy Act.

> If the act embrace such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust.

But this is not the relation spoken of in the [Act].

*Id.* at 208. Holding that "the act speaks of technical trusts and not those which the law implies from contract," the Court declined to except from discharge the factor's debt to his principal, despite the fact that the obligation was deemed a fiduciary debt under state law. *Id.*

Section 11 of the Bankruptcy Act of 1867 included the language of section one of the 1841 Act, but deleted the enumerated examples of executor, administrator, guardian or trustee, and simply provided an exception from discharge for debts arising from—

> defalcation as a public officer, or while acting in any fiduciary character.

*Central Hanover Bank & Trust Co. v. Herbst,* 93 F.2d 510, 511 (2d Cir.1937). In *Central Hanover,* Judge Learned Hand addressed the issue of whether a receiver in a mortgage foreclosure suit constituted a fiduciary subject to section 11 of the Bankruptcy Act. Judge Hand concluded that the 1867 Act's discharge exception for debts of "any fiduciary character," was limited to debts arising from the types of fiduciary capacities enumerated in the 1841 Act: public officers, executors, administrators, guardians, trustees, and "any other fiduciary capacity," which term was strictly construed under the *Chapman* decision as including only "special" or "technical" fiduciaries. *Id.* Judge Hand concluded the receiver was a fiduciary under the statute, and the disbursement of funds from the receiver's account without a final court order constituted a nondischargeable debt due to defalcation under the Act.

Current Bankruptcy Code § 523(a)(4) drops the reference to public officers, but contains essentially the same discharge exception for debts arising under a fiduciary capacity as existed under the 1867 Bankruptcy Act. Accordingly, I conclude that the term "fiduciary capacity" under section 523(a)(4), has the same meaning as under the Bankruptcy Act, and that the wealth of decisional law under the Act is properly considered as having continued vitality under

the Code. *See Turner,* at 651–654.[4] Although there was some disparity in the decisional law under the Bankruptcy Act, courts almost uniformly concluded that the term "fiduciary" did not include bailees, sureties, brokers, factors, and agents with the power to sell and collect purchase money, or partners in a joint venture.[5] Rather, the term "fiduciary" was generally limited to those fiduciaries specifically enumerated in the prior statute, such as executors, administrators, guardians, and trustees, or those acting under similar capacities pursuant to technical or express trusts. However, by excepting the obligation of a receiver from discharge in *Central Hanover,* Judge Learned Hand made clear that the enumerated categories of executor, administrator, guardian, and trustee, were not an exclusive list of fiduciaries subjected to the Act. Therefore, in the case before me, the fact that Norman was not acting as an executor, administrator, guardian, or trustee, is not dispositive of whether Norman was acting with the requisite fiduciary capacity. The issue is whether Norman acted with a fiduciary capacity comparable to those fiduciaries enumerated under the 1841 Act.

On the facts of the case before me, Norman is liable for debts related to the following transactions.

| Liability | Amount |
|---|---|
| Personal Property sold from Howard's Residence | $ 200.00 |
| Amount Overdrawn from Joint Account | $19,246.94 |
| Lincoln Proceeds | $12,000.00 |
| Funeral Refund and Veterans Death Benefit | $ 1,806.92 |
| Total | $33,253.86 |

The question is whether Norman acted with the required fiduciary capacity with respect to each debt.

4. This case presents a comprehensive historical analysis of the trends in judicial interpretation of the fiduciary capacity exception to discharge.

5. *See Chapman v. Forsyth,* 43 U.S. (2 How.) 202, 11 L.Ed. 236 (factors and commission merchants, when exercising their functions of receiving, selling, taking their commissions, and accounting to their principals, are not acting in a fiduciary capacity); *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393

*Property Sold.* Norman did not act with fiduciary capacity under section 523(a)(4), when he sold items of personal property from Howard's home and when he sold the Lincoln. There was no formal or express trust respecting the items sold. However, Norman is liable for the proceeds of these sales. And, a Nebraska court would be quick to impose a constructive trust on the proceeds of sale if such proceeds still existed. *See Biggerstaff v. Ostrand,* 199 Neb. 808, 261 N.W.2d 750, 754 (1978). But, it has long been settled that a debtor does not act with "fiduciary capacity" in the case of a constructive trust. Since Norman did not act in a fiduciary capacity respecting these sales, his obligation to the Probate Estate for the proceeds of sale is not excepted from discharge as a debt arising from defalcation while acting in a fiduciary capacity.

*Bank Account.* Norman also did not act with the requisite fiduciary capacity under section 523(a)(4), when he disbursed funds from the joint account. Having signature authority over the joint account does not constitute an express trust and it does not involve a level of fiduciary capacity comparable to that of an executor, administrator, guardian or trustee. Norman is liable for $19,246.94 for inappropriate disbursements of funds from the joint account. Again, while an appropriate remedy under Nebraska law might be a constructive or resulting trust on traceable proceeds, *id.,* such a trust is not within the scope of section 523(a)(4). The unauthorized withdrawal of funds from a joint account is generally not considered defalcation by a fiduciary under the Bankruptcy Code. *See In re Messineo,* 192 B.R. 597 (Bankr.D.N.H.1996) (debtor's withdrawal and

(1934) (chattel mortgagor in possession of collateral is not trustee for mortgagee under Act); *In re Camelo,* 195 F. 632 (N.D.N.Y.1912) (bailee or agent with power to sell and to receive purchase money is not fiduciary within meaning of Bankruptcy Act); *Sales Fin. Corp. v. Dimock,* 340 Mass. 310, 164 N.E.2d 133 (1960) (same); *American Sur. Co. v. Koff,* 268 A.D. 1055, 52 N.Y.S.2d 463, 464 (1945) (salesman, in collecting for his employer, did not have the status of "fiduciary" under Bankruptcy Act).

conversion of $25,000.00 from joint bank account held with old and infirm mother shortly before guardian was appointed was not defalcation by a fiduciary because no express trust existed when funds were withdrawn); *In re Cooper*, 30 B.R. 484 (9th Cir. BAP 1982) (no express trust existed, thus debtor was not acting in fiduciary capacity when making unauthorized withdrawals from joint account set up to assist sick grandmother in handling affairs); *In re Cook*, 38 B.R. 743 (9th Cir. BAP 1984) (a joint account designated as a Totten or tentative trust under California law, was not a technical or express trust, thus, withdrawals by debtor were not defalcation in a fiduciary capacity under section 523(a)(4)); *In re Dempster*, 182 B.R. 790 (Bankr.N.D.Ill.1995) (debtor not acting in fiduciary capacity in making withdrawals from joint account set up while cohabiting with creditor, thus withdrawals were not defalcation under section 523(a)(4)); *but see In re Pavelka*, 79 B.R. 228 (Bankr.E.D.Pa.1987) (denying debtor's motion for summary judgment on grounds that fiduciary relationship may have existed with decedent).

The fact that Norman held Howard's Power of Attorney does not mean that Norman acted with the required fiduciary capacity respecting the joint account. First, Norman made no withdrawals from the joint account under authority of the Power of Attorney. All withdrawals were made by Norman under his own signature authority. Second, acts of an agent are not generally considered to involve the level of fiduciary capacity required under section 523(a)(4). *See In re Epperson*, 45 B.R. 708 711 (Bankr.E.D.Tenn. 1985); *In re Weidman*, 18 B.R. 249, 251 (Bankr.E.D.Va.1982); *Savonarola v. Beran*, 79 B.R. 493 (Bankr.N.D.Fla.1987) (property manager not fiduciary with respect to rental bank account). Accordingly, Norman's wrongful withdrawal of $19,246.94 from the joint account does not constitute defalcation while acting in a fiduciary capacity within the meaning of section 523(a)(4).

■ *Funeral and Veterans Funds.* Norman was not acting in a fiduciary capacity when he converted the funeral expense refund and veterans benefit to his personal use.

*Embezzlement*

■ Debts which arise from embezzlement are also excepted from discharge under section 523(a)(4). Embezzlement is the "fraudulent appropriation of property of another by a person to whom such property has been entrusted or into whose hands it has lawfully come." *In re Phillips*, 882 F.2d 302, 304 (8th Cir.1989), *quoting In re Belfry*, 862 F.2d 661, 662 (8th Cir.1988). A plaintiff must establish that the debtor was not lawfully entitled to use the funds for the purposes for which they were in fact used. *Id.* In order to establish embezzlement, plaintiff must prove that (1) debtor was entrusted with property or lawfully came into possession of property of another; (2) debtor was under a prior restraint, whether written or verbal, as to the use of the property; and (3) the terms of restraint were violated by debtor's use of the property. *See Belfry*, 862 F.2d 661, 663 (8th Cir.1988); *Werner v. Hofmann*, 5 F.3d 1170, 1172 (8th Cir.1993). Debts which arise from simple conversion are not excepted from discharge. Plaintiff must prove that the conversions constituted embezzlement, and this requires proof of all the elements of embezzlement. *See In re Weber*, 892 F.2d 534, 539 (7th Cir.1989).

■ *Property Sold from Howard's Home.* As to the $200 received from the sale of household items from Howard's residence, the plaintiff has not proved that a fraudulent appropriation was involved. Norman's actions in selling these items of personal property were under color of authority. Howard had directed that family members could retain items of personal property. Thus, Norman could have simply retained the property for himself. I did conclude that Norman was liable for these funds, but such liability is for conversion, not embezzlement.

■ *Joint Account.* The first element of embezzlement is satisfied respecting the joint account because Norman lawfully came into possession or control of the $19,246.94 which belonged to Howard.

The second element of embezzlement is satisfied because Norman's use of Howard's funds was subject to the prior restraint that Howard's funds were to be used only as

directed by Howard or for his benefit. Under Nebraska law—

A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent.

*See* NEB.REV.STAT. § 30–2703 (Reissue 1989) (repealed 1993). Norman has not asserted that there is "clear and convincing evidence" that Howard intended to make a gift to Norman by giving Norman signature authority on the joint account. It is thus clear, under Nebraska law, that Howard owned the funds which Howard deposited into the joint account. It is also clear, under Nebraska law, that Norman is liable for any withdrawals from the joint account in excess of Norman's net contributions to the account, except to the extent that the funds were withdrawn at Howard's direction or for his benefit. Norman is deemed to know the law and thus to have been aware that he would be liable for wrongful use of Howard's funds. With respect to the transactions on which Norman is found to have liability, it is important to note that Norman does not claim that he had authority to use the funds for personal purposes, indeed, he acknowledges liability to the extent that he withdrew funds from the joint account other than at Howard's direction or for Howard's benefit. Under the facts of this case, Nebraska law placed a prior restraint upon Norman's use of Howard's funds.

The third element of embezzlement is satisfied respecting the joint account because Norman's use of Howard's funds violated the restraint that such funds be used at Howard's direction or for his benefit. Norman's actions thus constituted a fraudulent appropriation of $19,246.94 of Howard's property and Norman was not entitled to use the funds for personal use. Therefore, Norman's $19,246.94 debt to the Plaintiff respecting the joint account arises from embezzlement and is excepted from discharge by section 523(a)(4).

 *Transactions after Howard's Death.* At the time Howard died, Norman was in possession of the Lincoln and it was titled in Norman name. He sold the car for $12,-000.00 and retained the money. Norman also received $1,806.92 after Howard died from the refunds of prepaid funeral expenses and the receipt of veterans benefits. Norman had no right whatsoever to these assets. He had no authority to title the Lincoln in his name only, and a constructive trust is appropriately placed on that car, effective upon Howard's death, for the benefit of Howard's Probate Estate. Similarly, Norman had no right whatsoever, in his personal capacity, to the refund of funeral money or to the veterans benefits. I conclude that Norman's retention of these funds totalling $13,-806.92, constituted embezzlement or larceny. If Norman is considered to have obtained rightful possession of these funds, he embezzled them by failure to remit them to Howard's Probate Estate. *See In re Taylor*, 58 B.R. 849, 855–57 (Bankr.E.D.Va.1986) (unless circumstances beyond debtor's control exist, failure to remit proceeds held for another, despite an affirmative duty to do so, constitutes embezzlement). Larceny is the taking of property without the consent of the owner, with the intent to permanently deprive the owner. To the extent Norman did not have lawful possession of these funds, his conversion of the assets constituted larceny under section 523(a)(4).

### CONCLUSION

I conclude that the debtor is obligated to the Estate of Howard L. Stentz in the amount $33,253.86, and plaintiff shall have an allowed claim in this bankruptcy estate in said amount. I further conclude that $33,-053.86 of the allowed claim is excepted from discharge and shall not be discharged by any discharge order entered in this case.

A separate order will be entered consistent herewith.