# United States Bankruptcy Appellate Panel
FOR THE EIGHTH CIRCUIT

————————

06-6040/6041MN

————————

In re: JAMES BRUCE PREECE,          *
                                    *
        Debtor                      *
                                    *
BLUE SKIES, INC.;                   *
KEN SCHOENFELDER;                   *
CENTRAL BOILER, INC.,               *
                                    *
        Plaintiffs - Appellees      *    Appeal from the United States
                                    *    Bankruptcy Court for the
                v.                  *    District of Minnesota
                                    *
JAMES BRUCE PREECE,                 *
                                    *
        Defendant - Appellant.      *


————————

Submitted: February 15, 2007
Filed: March 19, 2007

————————

SCHERMER, FEDERMAN and VENTERS, Bankruptcy Judges

FEDERMAN, Bankruptcy Judge

        Debtor James Bruce Preece appeals from the Bankruptcy Court's[1] Judgments
that his debts to Ken Schoenfelder, Blue Skies, Inc., and Central Boiler, Inc. are

_____

        [1] The Honorable Nancy C. Dreher, United States Bankruptcy Judge for the
District of Minnesota.

nondischargeable under 11 U.S.C. § 523(a)(2)(A). For the reasons that follow, we affirm.

FACTUAL BACKGROUND

*Introduction*

Debtor Bruce Preece was the sole shareholder, director, and CEO of Helicopter Flight, Inc. ("HFI"), which had sold new and used helicopters, and was an authorized dealer of Robinson Helicopter Company's helicopters. Plaintiffs Blue Skies, Inc.,[2] and Central Boiler, Inc.[3] each gave funds to HFI for the purpose of purchasing helicopters but, in each instance, HFI did not supply the helicopter. After the Debtor filed his Chapter 7 bankruptcy petition, Blue Skies and Central Boiler each filed adversary actions seeking a determination that the Debtor's debts to them were nondischargeable. The cases were consolidated for trial.

*Blue Skies*

In November 2001, one Richard Stanger entered into a listing agreement with HFI for the sale of his R44 helicopter. Under the listing agreement, HFI was appointed as sales agent for a period of ninety days to sell Stanger's helicopter for $335,000. In exchange, HFI was entitled to a 5% commission on the sales price. HFI's appointment as sales agent expired on February 20, 2002.

---

[2] Ken Schoenfelder, also a named plaintiff in the adversary action by Blue Skies, is the principal of Blue Skies, Inc. Hereafter, they will sometimes be referred to collectively as "Blue Skies."

[3] Dennis Brazier is the principal of Central Boiler, Inc. Hereafter they will sometimes be referred to collectively as "Central Boiler."

2

HFI was unable to sell Stanger's helicopter under the listing agreement. In March 2002, after the listing agreement with Stanger expired, the Debtor contacted Ken Schoenfelder, the principal of Blue Skies, about a transaction involving Stanger's helicopter. The Debtor drafted a letter agreement dated March 21, 2002, which he and Schoenfelder both signed. Pursuant to this letter agreement, Blue Skies made a $260,000 loan to HFI for the express purpose of acquiring Stanger's helicopter for resale. The plan was for the Debtor to buy the helicopter from Stanger, and then try to re-sell it for a higher price, with Blue Skies and HFI sharing the profit.

Under this deal with Blue Skies, on or before May 21, 2002 (which was sixty days after they entered into the agreement), HFI was supposed to either (i) repay Blue Skies the $260,000 plus $10,000 and 50% of the profit on sale of the Stanger helicopter if it sold for more than $304,000, or, (ii) in the event HFI did not sell the helicopter within sixty days, HFI was to deliver an FAA Aircraft Bill of Sale on the Stanger helicopter to Blue Skies. In other words, by May 21, 2002, Blue Skies was to receive either a minimum of $270,000 or ownership of the Stanger helicopter. As further collateral for the $260,000 loan, the Debtor signed a UCC Security Agreement granting Schoenfelder a security interest in HFI's leasehold premises at the Crystal Airport. However, those premises were already subject to a security interest held by the Debtor's mother and, in addition, Blue Skies could not have executed on the security agreement and taken possession of the premises because of restrictions concerning ownership and operation of airport property. Hence, this security interest was probably worthless. Schoenfelder failed to perfect it in any event.

In accordance with the letter agreement, Blue Skies wire transferred $260,000 to HFI on March 22, 2002. However, the Debtor did not use the funds to acquire title to Stanger's helicopter, or any helicopter for that matter. Rather, the Debtor testified that he put the money into HFI's general operating account and used it for other purposes. He offered no evidence as to how any of the money was actually spent, however.

3

The May 21 deadline passed without the Debtor selling the Stanger helicopter or paying Blue Skies the $270,000. Then, on May 30, 2002, the Debtor made out an FAA Aircraft Bill of Sale purporting to transfer ownership of the Stanger helicopter from HFI to Blue Skies. This Bill of Sale had a transposed serial number. Moreover, because HFI did not own the Stanger helicopter, the Bill of Sale was meaningless. As a result, when Schoenfelder attempted to have it registered in Blue Skies' name, he was unable to do so. A state court later held that Stanger, and not Blue Skies, owned the R44 helicopter. Blue Skies ended up with neither the helicopter nor the $270,000.

*Central Boiler*

Central Boiler had previously purchased a Robinson R22 helicopter through HFI in 1993. In early 2002, Central Boiler's president, Dennis Brazier, contacted HFI about purchasing a new Robinson helicopter, an R44. The parties agreed upon a total purchase price of $303,414, less an "early payment discount" of $7,000, for a final price of $296,414. The expected delivery date was April 15, 2002. On February 8, 2002, Central Boiler made a $25,000 deposit and traded in the old R22 for a credit of $90,000 towards the purchase of the new R44. The Debtor memorialized the agreement by letter dated February 11, 2002. Central Boiler paid the balance of the sale price, $181,414, by wire transfer to HFI's account that same day. The parties agreed that when the old R22 was sold to a third party, $90,000 of the proceeds from that sale would be earmarked to go to Robinson toward Central Boiler's purchase of the R44.

Meanwhile, unbeknownst to Central Boiler, at the end of 2001, Robinson had informed HFI that, effective December 31, 2001, HFI was no longer a registered dealer or authorized to sell Robinson helicopters. Central Boiler found out about this when, on February 19, 2002, Robinson copied Central Boiler on a letter to HFI, expressly reminding HFI that the dealership agreement had expired on December 31, and that HFI was no longer authorized to represent itself as a Robinson dealer. The February 19 letter was written after Robinson became aware that HFI had purported

4

to sell a Robinson R44 helicopter to another person, James Bult, even though HFI was no longer authorized to sell Robinson helicopters. The letter indicated that Bult had paid HFI in full for an R44 helicopter, but Robinson had not received any of the funds, and Bult had not received his helicopter. The letter demanded that any payments HFI had received for Robinson helicopters be forwarded immediately to Robinson and, further, that any future payments made by HFI customers be paid directly by the customer to Robinson. Five parties, including James Bult, Central Boiler, and Dennis Brazier, were copied on the letter, apparently because Robinson had become aware that they all had paid HFI for Robinson helicopters.

By the time Central Boiler received this letter, it had already paid HFI in full for its helicopter. After the February 19, 2002 letter, the Debtor continued to assure Brazier that, despite the letter, HFI did not have a problem with Robinson, that the money Central Boiler had paid for its helicopter would go to Robinson, and that Central Boiler would get its helicopter. That did not happen.

All of the money Central Boiler paid to HFI went into HFI's general accounts, and, except for the initial $25,000 deposit, none of it went to Robinson for the purchase of the R44. In addition, HFI sold the traded-in R22 in April 2002 for $90,000 and deposited those proceeds into its general account. Fifty thousand dollars of that deposit was immediately set off by the bank while it was in HFI's account. Other than that $50,000, the Debtor did not account for any of the rest of the money Central Boiler paid, other than to say that it went into HFI's general operating fund and was used in the business. We note that James Bult was not listed as a creditor in the bankruptcy case, though there is nothing in the record as to whether any of Central Boiler's funds were used to take care of his claim.

*The Debtor's Insolvency and Bankruptcy Case*

According to the Debtor, HFI suffered dramatically from the September 11, 2001 terrorist attacks. HFI was insolvent at the time of all of the above transactions,

but, the Debtor says, he and his family continued to infuse large amounts of personal funds into HFI, in an attempt to "resurrect" the company. The Debtor estimates that these contributions from his family totaled over $600,000. Again, he offered no evidence as to how these funds were used. In any event, these contributions are not relevant to the question of whether he intended to defraud the Plaintiffs.

On June 12, 2002, Security Bank obtained an Order for Seizure against HFI for all of HFI's inventory, accounts, equipment, and certain helicopters in HFI's fleet. The Debtor filed a voluntary Chapter 7 petition on July 11, 2003. Blue Skies and Central Boiler filed adversary actions seeking determinations of nondischargeability under § 523(a)(2), (4), and (6). The court entered Judgments in favor of each of the Plaintiffs, finding the Debtor to be personally responsible for HFI's debts to them, and finding the debts to be nondischargeable under (a)(2); therefore, it did not need to decide the (a)(4) and (a)(6) questions. The Debtor appeals.

DISCUSSION

*Procedural Issue on Appeal*

Blue Skies points out that the Debtor's brief was untimely and requests that we disregard it. Federal Rule of Bankruptcy Procedure 8001(a) provides that "[a]n appellant's failure to take any step other than timely filing a notice of appeal does not affect the validity of the appeal, but is ground only for such action as the district court or bankruptcy appellate panel deems appropriate, which may include dismissal of the appeal."[4] While "[f]iling deadlines serve an important judicial function and tardiness shall not be taken lightly," if the appellee's prejudice is not of such a degree that the reviewing court should not reach the merits, the reviewing court can consider the

---

[4] Fed. R. Bankr. P. 8001(a).

untimely brief.[5]  In this particular instance, we find that any prejudice to Blue Skies and Central Boiler in considering the Debtor's brief is minimal. Blue Skies' request that we disregard the Debtor's brief is, therefore, DENIED.

## *Standard of Review*

The BAP reviews findings of fact for clear error, and legal conclusions *de novo.*[6]  "A bankruptcy court's finding concerning intent is a factual finding subject to the clearly erroneous rule."[7]  A finding is clearly erroneous when the reviewing court is "left with the definite and firm conviction that a mistake has been committed."[8]

## *The Debtor's Personal Liability for HFI's Debts*

The Debtor does not appeal the bankruptcy court's finding of personal liability for HFI's corporate debts, under piercing the corporate veil or any theory. Accordingly, we do not address it here.

---

[5] *See Frank Seitzinger Farms, Inc. of Iowa v. Waller*, 67 B.R. 869, 871 (D. S.D. 1986).

[6] *First Nat'l Bank of Olathe v. Pontow (In re Pontow),* 111 F.3d 604, 609 (8th Cir. 1997); *Sholdan v. Dietz (In re Sholdan),* 108 F.3d 886, 888 (8th Cir. 1997); Fed. R. Bankr. P. 8013.

[7] *In re Jones*, 31 F.3d 659, 662 (8th Cir. 1994).

[8] *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

*Nondischargeability Under § 523(a)(2)(A)*

Section 523(a)(2)(A) provides an exception from discharge for any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."[9]

In *Field v. Mans*,[10] the United States Supreme Court held that § 523(a)(2)(A) encompasses common law misrepresentation or actual fraud.[11] To prove actual or common law fraud, a creditor must prove, by a preponderance of the evidence, the following:

(1) the debtor made a false representation;

(2) at the time the representation was made the debtor knew it was false;

(3) the debtor subjectively intended to deceive the creditor at the time he made the representation;

(4) the creditor justifiably relied upon the representation; and

(5) the creditor was damaged.[12]

In his brief, the Debtor argues only that the bankruptcy court erred with regard to the third element - intent to defraud. "As a general rule, an appellate court may

---

[9] 11 U.S.C. § 523(a)(2)(A).

[10] 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995).

[11] *Id.* 516 U.S. at 70-72, 116 S. Ct. at 443-44.

[12] *In re Ophaug*, 827 F.2d 340 (8th Cir. 1987), as supplemented by *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437(1995); *In re Moen*, 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999).

review only the issues specifically raised and argued in an appellant's brief."[13] Therefore, we will only consider whether the Plaintiffs established the Debtor's intent to defraud. Since a debtor's mental state is difficult to prove, fraudulent intent may be proved by direct or circumstantial evidence.[14] The Debtor asserts that this case is nothing more than a typical business failure or breach of contract case. He says he was merely attempting to keep his failing business afloat, and the bankruptcy court erred in concluding otherwise.

As shown, the Debtor had been advised in December 2001 that Robinson was terminating his dealership. Nevertheless, he continued to represent himself as authorized to sell Robinson helicopters. Further, even after receiving the February 19, 2002 letter, he told Dennis Brazier that the letter was simply due to Robinson's policy changes brought on by its quick growth. He said the relationship between HFI and Robinson was fine, and the letter was, in effect, meaningless. He assured Brazier that Central Boiler was going to receive its new Robinson helicopter, even though HFI was no longer authorized to sell them and HFI had not paid Robinson for it.

Indeed, the Debtor expressly told each of the Plaintiffs that he was using their respective funds to purchase a specific helicopter, but failed to do so. With Blue Skies, the Debtor represented to Schoenfelder that HFI was buying the Stanger helicopter. With Central Boiler, the Debtor represented to Brazier that he was acquiring the particular Robinson R44 that Central Boiler had ordered, and that even the proceeds from the sale of the trade-in R22 would be "earmarked" for that purchase.

---

[13] *United States v. Simmons*, 964 F.2d 763, 777 (8th Cir. 1992) (citing *United States v. Olano,* 934 F.2d 1425, 1439 (9th Cir. 1991)). The Debtor did raise justifiable reliance and proximate cause in his "Statement of Issues" but did not discuss how the court erred in so finding. In any event, the Plaintiffs justifiably relied on the Debtor's misrepresentations.

[14] *In re Moen*, 238 B.R. at 792.

The Debtor argues that he was not able to use these funds to purchase those helicopters because he had to pay others to keep the business open. But the record contains ample evidence to support the bankruptcy court's finding that these transactions involved more than merely keeping the business afloat. As the bankruptcy court found, the Debtor had to have obtained these funds knowing that they would not be available to purchase the helicopters he promised the Plaintiffs to purchase.

For example, as to Blue Skies, during the three-month period that HFI had held the Stanger helicopter on the consignment-type listing agreement, the best offer HFI received was $245,000. Despite that, the Debtor then entered into the transaction with Blue Skies whereby, in order to merely break even, HFI would have to sell the Stanger helicopter for at least $270,000. Although the Debtor had been in the helicopter business for many years, he represented to Schoenfelder that he could sell it for that amount, and perhaps significantly more than that. Further, despite his representations to Schoenfelder that he was going to use Blue Skies' funds to purchase the Stanger helicopter, the Debtor took no steps whatsoever to actually make the purchase from Stanger. He even took steps to hide the situation after the money was gone by tendering the fake Bill of Sale to Blue Skies. The bankruptcy court did not err in concluding that the Debtor intended to defraud Blue Skies through this transaction.

Similarly, with regard to Central Boiler, the Debtor made express representations that he was going to purchase a specific helicopter on Central Boiler's behalf, but then used the money for other purposes. Other than the $50,000 that was set off by the bank, the Debtor had no explanation whatsoever as to where Blue Skies' money went, nor did he present any evidence that he had taken any steps to actually acquire Central Boiler's helicopter, other than placing the initial order for it. HFI even sold Central Boiler's trade-in but did not use those funds to buy Central Boiler's new helicopter, despite the Debtor's admission that he had agreed to earmark those funds for that purpose. And, again, the Debtor took proactive steps to hide the fraud by

10

reassuring Brazier that everything was fine after he received Robinson's February 19 letter stating that HFI was no longer authorized to sell Robinson helicopters.

CONCLUSION

In sum, the record supports the bankruptcy court's conclusion that the Debtor entered into agreements with the Plaintiffs knowing that he would not be able to comply and with the intent to defraud. Accordingly, the bankruptcy court's Judgments in favor of Blue Skies, Inc., Ken Schoenfelder, and Central Boiler are AFFIRMED.

_____