In re Cindy NEUMANN, a/k/a Cindy Whetstone, and John Neumann, Sr., Debtors.

Minnesota Fair Plan, Plaintiff,

v.

Cindy Neumann, a/k/a Cindy Whetstone, and John Neumann, Sr., Defendants.

Bankruptcy No. 04–51118.
Adversary No. 05–5005.

United States Bankruptcy Court, D. Minnesota.

Aug. 17, 2007.

Walter W. Vasil, Duluth, MN, for Debtors.

Wendy M. Canaday, Flynn Gaskins & Bennett LLP, Minneapolis, MN, for Plaintiff.

Andrew Engebretson, Duluth, MN, for Defendants.

## MEMORANDUM DECISION AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Chief Judge.

This adversary proceeding came on before the Court for trial. The Plaintiff appeared by its attorneys, Bradley J. Ayers and Wendy M. Canaday. Defendant Cindy Neumann appeared personally and by her attorney, Andrew Engebretson. The following memorializes the decision on the issues presented at trial, based on the evidence received and the arguments of counsel.

## INTRODUCTION

This is an adversary proceeding for determination of dischargeability of debt, arising out of the Defendants' bankruptcy case under Chapter 7. When they filed their bankruptcy petition on October 5, 2004, the Defendants were residents of Duluth, Minnesota, and were husband and wife. After that, the Defendants physical-

ly separated, and they went through and completed proceedings for the dissolution of their marriage. They responded separately to this adversary proceeding. Defendant Cindy Neumann ("the Defendant") retained counsel and actively defended. Defendant John Neumann, Sr. ("John") did not file an answer or otherwise appear. The Court granted a default judgment in favor of the Plaintiff against John, on the Plaintiff's motion and over the objection of the Defendant.[1] As against the Defendant, this matter went ahead to a trial that spanned three separate days in court.

The Plaintiff is a scheduled creditor in the Defendants' bankruptcy case. In 2002, it had issued a policy of homeowner's insurance to the Defendants, including casualty coverage for the home's structure.

The Plaintiff's pleaded theory of nondischargeability sounds in fraud, 11 U.S.C. § 523(a)(2)(A). However, it is wrapped around the accusation of an act of intentional destruction: arson. The gist of the theory is that the Defendant obtained money or property (the benefit of certain payments made pursuant to the homeowner's insurance policy) on a specific representation or pretense (that the underlying casualty loss was occasioned by accident or other cause not attributable to the Defendant and not known to her) when in fact she had participated in the arson, or at least knew at the time of the application for benefits that the fire in question had been intentionally set. Via this adversary proceeding, it seeks a judgment that it is entitled to recover the amount of the payments from the Defendant, and that the debt evidenced by that is excepted from discharge in bankruptcy.

Prior to the trial in this adversary proceeding, it had never been established by a

court of competent jurisdiction that the fire was caused by arson. Thus, the Plaintiff undertook to prove that, as a predicate fact for its theory of nondischargeability. The adjudication of this matter thus requires two main stages of fact-finding and analysis.

The first addresses the question of whether arson did occur. If that finding is made in favor of the Plaintiff, the second is whether the Defendant knowingly misrepresented that the fire was started by a source unknown to her, with which she had nothing to do, when she applied for benefits as an insured of the Plaintiff. Because the issues and the sources of governing law are so distinct, the fact-finding will be segregated to each stage in the decision in order to make the analysis more readily comprehensible. However, a recitation of certain basic statuses, relationships, transactions, and acts will better set the stage for the main discussion. At trial, none of these threshold points were controverted as matters of fact.

## BACKDROP RELATIONSHIPS, EVENTS, AND TRANSACTIONS

1. The Defendant met John in May, 2000, at a time when she was the single mother of three children. She and John began cohabiting "some time after that." They got married in June, 2001.

2. The Defendant and John occupied a modest house located at 203 3rd Street, in Cloquet, Minnesota. The Defendant had acquired this house in her individual right in November, 1998, before her marriage to John. At all relevant times, the title reposed in her individually.

3. Before early 2002, the Defendant had maintained homeowner's coverage on the house through CNA. John and the

---

1. The Defendant's counsel's concern was that the making of findings in support of a default judgment against John would preclude his client from maintaining certain avenues of

defense. At that time, the Court ruled that it would not. The content and outcome of this decision should lay the concern to final rest.

Defendant submitted a series of three casualty-loss claims to CNA in 2000–2001. CNA denied the third such claim and then canceled the coverage in early 2002. For a time the property was covered by "forced placement" insurance through a mortgagee. Then John obtained homeowner's insurance from the Plaintiff under a policy that included casualty loss coverage. He had sought to get $120,000.00 in such coverage from the Plaintiff. However, based on its determination of the value of the house, the Plaintiff issued a policy with a limit of $86,000.00 on October 12, 2002. The Defendant did not accompany John when he applied for or received the policy. She was not involved in the process of procuring the insurance coverage in any way. Both John and the Defendant were identified as named insureds on the policy.

4. Shortly after 3:00 a.m. on November 26, 2002, a fire broke out in the basement of the house. Quickly spreading and resistant to the attack of firefighters from the Cloquet Fire Department, the fire almost totally destroyed the house.

5. At the time of the fire, the house was encumbered by a mortgage in favor of Washington Mutual Home Loan, Inc., securing a debt of over $50,000.00. The Defendant had incurred this debt in December, 2000, when she paid off her adjustable-rate purchase-money financing for the house through a "refinancing" transaction.

6. After the fire, John and the Defendant made a claim to the Plaintiff for casualty loss under the policy. Apparently they submitted an initial oral request for benefits, very soon after the fire. Later they submitted a more formal claim in writing.

7. The Plaintiff made payment of a total of $59,182.01 on the claim. Of that sum, $2,500.00 was paid directly to the Defendant and John for "emergency assistance" in the immediate wake of the fire, under the "Loss of Use" coverage. The balance was paid to the mortgagee, under the "Mortgage Clause" of the "Conditions" section of the policy.

## DISCUSSION[2]

### A. The Merits: Plaintiff's Pleaded Theory (11 U.S.C. § 523(a)(2)(A)).

#### 1. Introduction.

As insurer to the Defendant and John, the Plaintiff advanced a substantial sum of money to them or for their benefit, on the claim they made after the November 26, 2002 home fire. The Plaintiff did so in reliance first on their initial oral notice of the fire and then on a "Sworn Statement in Proof of Loss." The latter document was executed by the Defendant and John under a notary-administered oath on January 24, 2003, as part of their written claim. After attesting to a "Whole Loss and Damage" from the fire of $137,600.00 in value, the Sworn Statement provides, in pertinent part:

Time and origin: A *Fire* loss occurred about the hour of *3:30 AM* on *11–26–02.* The cause and origin of said loss were: *Cause & Origin of Fire unknown at this time.*

. . .

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void· . . . [3]

---

2. This section will include both findings of fact and conclusions of law, mixed as appropriate in the treatment of the two stages of the analysis.

3. This document is in evidence as Plaintiff's Exhibit 4. The text noted in italics was a handwritten completion; the balance is the language of the form.

Under the "Exclusions" section of the main text of the policy, the Plaintiff provided that it did "not insure for loss caused directly or indirectly by," among others:

8.  Intentional Loss

Intentional Loss means any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss.

In the event of such loss, no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss.[4]

In a section of endorsements, entitled "Special Provisions—Minnesota," the policy further provided:

2.  Concealment or Fraud

a.  Under Section I—Property Coverages:

(1) With respect to loss caused by fire, we do not provide coverage to the "insured" who has:

(a) Before a loss, willfully; or

(b) After a loss, willfully and with intent to defraud;

concealed or misrepresented any material fact or circumstance relating to this insurance.[5]

▮▮▮ Given the making of the claim and the Plaintiff's disbursements to the Defendant and John and to the mortgagee, the Plaintiff has established several of the elements of a debt nondischargeable under 11 U.S.C. § 523(a)(2)(A), as follows:

1.  The Defendant made representations of fact—i.e., that she did not know the origin of the fire at the time she and John submitted the claim, and that in any event the fire had not been caused by an act performed with the intent to cause a property loss.

2.  The Plaintiff relied on the representations, and did so justifiably under the circumstances.

3.  In reliance, the Plaintiff advanced the payments.

4.  Hence, the Defendant received money, directly and indirectly via the satisfaction of her debt to the mortgagee, as a result of the Plaintiff's reliance.

*See,* as to elements of § 523(a)(2)(A), *In re Van Horne,* 823 F.2d 1285, 1287 (8th Cir. 1987) and *In re Ophaug,* 827 F.2d 340, 343 (8th Cir.1987), as modified by *Field v. Mans,* 516 U.S. 59, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).[6] The Plaintiff's burden of proof is a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

If the Plaintiff is to prevail, however, it must prove several additional elements: that the representations were false; that the Defendant knew that they were; and that she made them with intent to deceive

---

**4.** This provision is at "Page 9 of 19" of the policy, which is in evidence as Plaintiff's Exhibit 2, at Bates no. 18 of the exhibit.

**5.** This provision is at "Page 6 of 7" of the Endorsement, Plaintiff's Exhibit 2, Bates no. 8.

**6.** The Defendant did not really challenge the Plaintiff on these isolated elements, in the abstract or otherwise. Thus, even though the Plaintiff did not produce an employee to attest to the actuality or justifiability of the Plaintiff's reliance, findings can be made in its favor on them. The justifiability of the reliance, in context, is a matter of common-sense inference: if intentionally-caused property loss is excluded under a policy and the concealment of such wrongdoing mandates denial of coverage, and such limitations on an insured's rights are as clearly disclosed in the policy as they were here, an insurer is fully justified in presuming that an insured is being honest in making a claim that is supported by the notice of a claim made immediately after a casualty loss and the later averments in a "Sworn Statement."

the Plaintiff—i.e., to induce it to change position, to honor its duties as insurer by compensating its insureds for their loss.[7] These elements are the focus of the parties' dispute.

As in any fraud case under the common law,[8] the predicate act is the telling of a lie, a false representation of past or present fact, "something said, done, or omitted by a person with the design of perpetrating what he knows to be a cheat or deception." *In re Moen,* 238 B.R. at 791 (quoting *In re Stentz,* 197 B.R. 966, 981 (Bankr.D.Neb. 1996); interior quotation marks omitted). Here, the Defendant made two affirmative representations in the written claim, of no knowledge of the fire's cause and of a loss not occasioned through an intentional act.[9] The falsity-in-fact of these representations would be established by a finding that the fire had been the product of arson. If the Plaintiff is successful in that, a second-level misrepresentation (as well as the second element of the *Van Horne/Ophaug* test) would be established by preponderat-ing evidence that the Defendant knew about the arson when she and John submitted their claims to the Plaintiff.

## 2. Was Arson Committed?

▉▉▉▉ Minnesota state law furnishes guidance for this first factual inquiry. Nearly three decades ago, in the context of litigation over a homeowner's claim against his insurer on a property loss caused by fire, the Minnesota Supreme Court observed:

> Because direct proof of arson is seldom available, courts have permitted the insurer to use circumstantial evidence to support the inference that the insured set the fire or arranged to have it set.

*Quast v. Prudential Property & Cas. Co.,* 267 N.W.2d 493, 495 (Minn.1978). Thus,

> . . . proof of the fire's incendiary origin plus evidence of the insured's financial difficulties which suggested a motive [are] sufficient to support a jury verdict for the insurance company.

7. As to the essence of an "intent to deceive" as the simple intent to induce a creditor to change position, *see In re Gibson,* 149 B.R. 562, 572 (Bankr.D.Minn.1993), and *In re Moen,* 238 B.R. 785, 791 (8th Cir. BAP 1999). The whole basis of the Plaintiff's theory on these elements was that the origin of the fire was not unknown to the Defendant at the time of her claim, and that the origin lay in the intentional act of arson; that the Defendant knew that, contemporaneous with the claim; and that she concealed that knowledge and the true origin of the fire, to induce the Plaintiff to make payment on the claim as if the fire had been caused by an accident.

8. *See Field v. Mans,* 516 U.S. at 70–72 and n. 9, 116 S.Ct. 437 (use of "common-law terms" in text of § 523(a)(2)(A) "impl[ies] elements that the common law has defined them to include"; thus § 523(a)(2)(A) is to be construed "to incorporate the general common law of torts"); *In re Lauer,* 371 F.3d 406, 413 (8th Cir.2004); *In re Dallam,* 850 F.2d 446, 449 (8th Cir.1988); *In re Preece,* 367 B.R. 647, 652 (8th Cir. BAP 2007).

9. There is nothing in the record regarding the submission of a written claim before the tender of the Sworn Statement, which was done nearly two months after the fire. However, it is reasonably clear that John or the Defendant or both contacted the Plaintiff or its agent right after the fire, to report the fire and the loss, and that the Plaintiff promptly responded by disbursing the $2,500.00 in "emergency" benefits. Though the evidence is none too pointed, it is found that the Plaintiff relied on an implied representation, i.e., a pretense, as to the same two facts, when it made the first disbursement. Under § 523(a)(2)(A), a false pretense—any "implied misrepresentation or conduct intended to create and foster a false impression"—is as actionable as an overt but untrue statement of ostensible facts. *In re Moen,* 238 B.R. at 791 (citation and interior quotation marks omitted). *See also In re Anderson,* 181 B.R. 943, 951 (Bankr. D.Minn.1995).

*Id.* (citing *Elgi Holding, Inc. v. Insurance Co. of North America,* 511 F.2d 957 (2nd Cir.1975)). A finding of motive—i.e., the need and wish for an unmerited recovery on casualty insurance coverage—may be made where the insured was "deeply in debt" to third parties and had not been successful in liquidating the value in the insured property through a sale. *Id.* In turn, a finding of incendiary origin at the hands of an insured is bolstered by proof of "opportunity, together with evidence negating accidental cause." *Id.* (citing *Fenton Country House, Inc. v. Auto–Owners Ins. Co.,* 63 Mich.App. 445, 234 N.W.2d 559, 561 (1975)). An insurer seeking to prove an act of arson by its insured has the standard civil burden of proof, of a preponderance of the evidence. *Id.*

█ On the origin of the fire and the possible role of the Defendants, the Plaintiff presented testimony from a number of witnesses. These included the firefighters of the Cloquet Fire Department who had been on the scene; publicly- and privately-employed fire investigators; a police officer; and a mechanical engineer, as an expert witness on potential causes in the function of basement appliances. Almost all of this testimony was detailed and convincing, at times to the point of being gripping. Almost all of it was unruffled and unchallenged on cross-examination.

### a. Incendiary Origin.

In its entirety, the evidence supports the following basic findings as to the physical start of the fire.

1. The fire broke out on the floor of the basement in two separate locations, a larger blaze to the east of the furnace and a smaller one in the southwestern corner of the basement.

2. The flames in both locations were unusually hard to quell with water; after a spraying, flames would go down and then flare back up again to several feet in height. To the firefighters, the fuel for the fire appeared to float on top of the water. This indicated the presence of a flammable liquid in a quantity significantly greater than would have resulted from an accidental spill, cleaned up or not. The sustained use of a 2.5″ hose line inserted through a basement window had no visible effect on the burning for quite some time.

3. The flames in the southwestern corner were very hot and emitted a dark black smoke.

4. Despite the firefighters' strenuous efforts, the flames rose to the ceiling of the basement and then into the structure of the house, ultimately weakening the first-story flooring and causing it to cave in.

5. There were numerous gas cans, most of them without fluid gasoline contents, just inside the back entry door to the basement; a plastic boating-fuel container with liquid gasoline against the west wall; an open soda pop can with gasoline in it, on top of an unused refrigerator near the back entry; and a gas can with gas content and paper stuffed in its spout, on top of the freezer.[10] No evidence was offered to justify the presence in the basement of liquid gasoline in a non-sealed container.

6. John stored containers of several petroleum products at the workbench that was located east of the furnace: motor oil, new and used;

---

10. On-site use of a trained dog and later off-site testing by the Minnesota Bureau of Criminal Apprehension both established the presence of gasoline in these containers.

transmission fluid; and propane cylinders, large and small. An open five-gallon bucket had oil in it.

7. The wall around the wiring to a light switch just inside the basement entry door in the rear of the house had been manually opened up by the removal of wall material. Crumpled newspaper and a crumpled waxy paper root-beer carton had been inserted around the visible wiring. There was a small trail of crumpled paper from that stuffed around the wiring down to the pop can on the refrigerator. After the fire, the newspaper had detectable gasoline residue on it.[11]

8. The fuse box by the back stairway was "just hanging there." John had dismounted it from the wall in the course of remodeling work, but he had not remounted it.

9. The yard around the house, including both sides leading to the back, was cluttered with scrap wood, metal junk, and other debris. This made it very difficult for the firefighters to get back to the only entry to the basement-situs of the fire, as the stairwell-entry to the basement from the first floor had been locked and otherwise blocked. The firefighters' personal use of a hose at the situs of the blaze was made more difficult by this limited access due to the 150–foot maximum length of the hoses initially brought to the scene. Their actual entry was delayed by several crucial minutes.

10. The origin of the fire could not have been in the new furnace in the basement, which had been installed less than six months before the fire. After the fire, the furnace's

air intake and exhaust vents showed no burn damage; the interior insulation and its very fragile metal foil covering were intact; brass fittings on top of the furnace were not only unmelted, they were essentially untouched; and the "v-pattern" of burn damage on the exterior surface and the return air plenum was consistent only with a fire burning outside the furnace and to its east. The surface of a wooden support pillar just inches from the furnace was "alligatored" by burning, but the burnt area was on the side opposite from the furnace.

11. The origin of the fire could not have been in the water heater in the basement, which was located behind the furnace. The water heater had less burn damage than the furnace (indicating a flame source on the other side of the furnace); there were no signs of fire at the base of the water heater; and the intact, unburned, and unmelted plastic line at the top of the water heater was wholly inconsistent with a fire originating inside the appliance.

12. The fire could not have been due to a leak in natural gas service to the house. Had there been such a leak, the rising natural gas would have caused a major explosion if ignited near the floor. This would have smashed the house structure to pieces and blown them distances over a large area. The latter did not occur.

13. The origin of the fire could not have been in an electrical spark or in any heating of surrounding materials induced by electrical short-

---

**11.** The residue was established by the same two testing methods identified in n. 10.

ing. None of the investigators found any evidence of an electrical short in wiring, fixtures, or appliances.

### b. Opportunity.

The evidence supports the following basic findings that go to the opportunity to set a fire in the basement, that an occupant in the house would have had on the night of the fire.

14. The Defendant and John resided by themselves in the house. They were at home alone after the mid-evening and through the night on which the fire took place. The front door was locked throughout that time.

15. The smoke detector or detectors that had been in the house did not work on the night of the fire. John had disabled or disconnected them at some point during his several-year, self-funded remodeling of the house.

The evidence supports the following findings that go to the possibility of a third party entering the house and setting the fire:

16. After the fire there was no sign of forced entry through the door to the basement at the back of the house. Neither the door itself—an inexpensive one of relatively recent manufacture—nor its jamb showed any splintering, cracking, or other impact-caused damage. The small dimple on the metal doorknob was not caused by forced entry; it was the result of a random impact on a cheaply-made fixture, prior to and unrelated to the fire.

17. Due to the configuration of the back basement door's lock mechanism and strike pad, it would have been impossible to prise the bolt open with a credit card or other thin device.

18. Before the outbreak of the fire, none of the three dogs in the house barked or otherwise exhibited any alarm of the sort that a dog would have shown at the presence of an intruder in the house. The Cloquet police had been called to the house on prior occasions during the Defendants' occupancy, on barking-dog complaints.

19. It was the Defendant's and John's practice to keep the rear entry door to the house locked. They alone kept the keys for it, and no keys were missing or unaccounted on the night of the fire.

20. When the firefighters arrived, they found that the rear entry door that led to the basement was open, but with its knob in a locked position. Almost to a man, they observed no physical sign of forcible entry, as they themselves went through the door on their first attempt to quell the fire.

### c. Motive.

The evidence supports the following basic findings that go to the motive to start a fire on which a casualty-loss claim could be made against the Plaintiff.

21. Since 1995, the Defendant has been employed on a full-time basis for an Iron Range-based optometrist with a regional practice. She started as a receptionist placed through a temporary agency and ultimately was promoted to the position of manager of his offices in Duluth. Depending on her work schedule, she received between $400.00 and $700.00 net for a two-week pay period. Her annual gross income for 2002 was $23,300.00, derived from

her employment with the optometrist and a minor part-time job with a local motel. This was not appreciably different from her individual annual income in 2000 and 2001. Before she met the Defendant, her income from this employment plus child support and a small disability-income grant for one of her sons had been sufficient to meet her and her dependents' needs.

22. For the term of his relationship with the Defendant, John had no "regular job" and was employed only sporadically and marginally. His last employment was delivering newspapers on a route that he held jointly with one of the Defendant's sons; he quit this job in late October, 2002. Earlier in 2002, John had considered going into the business of buying older homes for remodeling and sale, possibly starting with a duplex that he and the Defendant would occupy after a sale of her house. However, he never followed up on this thought.

23. During 2002, the Defendant lost the actual or potential sources of household income that she had previously received through her children. Her adult daughter, who had been living in the Defendant's house with her boyfriend, moved out; this ended the infrequent and negligible payments from them to the Defendant toward the rent of $150.00 that they had agreed to pay her. More crucially, in mid–2002 the Defendant lost the temporary custody of her two minor sons. By October, 2002, this deprived her of the child support she had been receiving from their father, of $157.00 per week, and she became obligated to pay child support to the father. She also lost the monthly disability-program payment that she had been receiving on the account of one of the sons.

24. When the Defendant bought the house, it had not been updated from its original configuration. It also suffered from deferred maintenance and outdated and deteriorated finishes. After John moved in, he began to remodel the house top to bottom, "step by step," doing the work himself or with the Defendant's brother Scott Whetstone. He seems to have purchased the materials only as money was available for them. This made for a long process with only sporadic progress. As of June, 2002, the only room on which work had been substantially completed was the kitchen; a bathroom was in process but still "stripped to the studs"; other than some replaced windows, the rest of the house was in "generally poor condition"; and all the other rooms needed renovation, including new floor coverings. At that time John was also planning to replace two staircases of older design with more modern one-flight arrangements. This job required major structural reconfiguration. It would have cost a minimum of $20,000.00 to complete all of this work through a contractor, in labor and materials. By late November, 2002, John had done most of the work on the bathroom and had stripped the walls in a back bedroom; the kitchen lacked sheet-rocking on only one wall; and the living room was "in pretty good shape." However, the staircase work was still unstarted; the attic was still uninsulated and was blocked off by plastic sheeting; and the work on all of the other rooms was yet to be undertaken.

25. Without the completion of the work just noted, the house was not suitable for marketing and sale, and would not have been accepted for listing by the one real estate agent whom John had consulted. Had the work been completed and the property listed for sale, the likely asking price would have been $80,000.00. The probable gross sale proceeds would have been 95% of the asking price.

26. In the summer of 2002, John prevailed on the Defendant to withdraw the balance in her 401(k) retirement account through her employment, stating that they "could use that to finance the repairs to the house." She then drew out nearly $6,500.00 from the account. At the time, she did not think that they "were in any financial trouble at that point."

27. By the date of the fire, the Defendant was delinquent by three to four months on her mortgage payment, her automobile financing, and a VISA credit card, all of which she had maintained on her individual account. At the same time, John had two or more VISA charge accounts, but had no current charging privileges on them due to payment delinquencies and over-limit status.

28. As of the date of the fire, the joint checking account that the Defendant and John had maintained was in overdraft status, with a "negative balance" of over $1,300.00. During the week immediately preceding the fire, John had negotiated eight checks from this account, made out to "cash," at a Cloquet bar. He had received over $800.00 in total from this. All of these checks were returned to the bar's proprietor on or immediately before the date of the fire.[12] These checks were all passed to individual bartenders, on dates such that they were presented for payment and dishonored over a weekend. This resulted in a lapse of five or more days before the bar's proprietor received notice of dishonor. John, "pretty much a [daily and daytime] regular" at the bar, had cashed checks there for some time, and had had around $500.00 outstanding in such checks at any given point in 2002.

d. Conclusions.

As to the unadorned issue of whether arson was committed in connection with the fire, this matter is virtually on all fours with the considerations under *Quast*.[13]

First, every last bit of credible, probative evidence points to the fire having been deliberately set. The evidence directly supporting the finding is far more than preponderant: the obvious use of petrochemical accelerants in two different locations; the locations of the ignition being in fairly close proximity to multiple containers of petroleum products, both open and closed, in liquid and vapor form; and the placement of at least some of these instrumentalities near the back stairwell and opened areas in walls, furnishing upward vectors for flames from them. The evidence is sufficient to establish planned acts of subterfuge, however crudely-conceived and -executed they may have been: the

---

12. The proprietor testified to driving to the house on the morning of November 26, to try to collect the money, and finding it "smoldering."

13. As will be seen, the use of the passive voice in the first clause of this sentence is entirely deliberate.

stuffing of paper (prepared to enhance its flammability) around open and older electrical wiring, to misdirect an investigation into cause; the presence of a loosely-hanging fuse box, that could and should have been reattached, probably motivated by a similar plan; and the outbreak of an accelerated blaze in front of a furnace and close to stacked open containers of used oil and propane tanks, probably with the idea of igniting the fuel in them but in any event likely to draw attention to them as a putative source of outbreak. The uncontroverted expert testimony on the record, as well as the narratives of fact witnesses experienced in quelling fire, conclusively rules out any accidental cause in electrical short, appliance malfunction, or spontaneous combustion.[14] This fire was deliberately set by human being.[15]

Second, the evidence preponderates to identify a concurrent occupant or occupants of the house as the one(s) with the opportunity and access to do the igniting. There was no evidence at all that any outside party bore such ill-will to either the Defendant or John, so as to prompt a torching of their house and all of the havoc that could result.[16] There was no evidence that a third party gained access to the basement situs of the fire, by force or otherwise, at any time before the outbreak of the fire.[17]

Finally, the record fully supports an inference of the sort of motive recognized in *Quast*—an overpowering need for cash, prompting the desire to mulct an insurer by a contrived claim on casualty coverage. As a matter of bare economic fact, the members of this small household were in grave financial distress in October and November, 2002. From an income perspective, the household had just experienced a severe reduction in the past level of cash-flow to the fisc. There had been no corresponding reduction in fixed debt service and current living expenses. And there was no immediate prospect of making up the shortfall. John was just not working.[18]

From a secondary perspective, structural and asset-based, the household was even more financially troubled. There was not enough current income to make the mortgage payments; consequently, there was a threat of foreclosure, and the resultant loss of any equity in the property. The recovery of equity from the house via sale was impossible unless the remodeling was completed. And there was no money to fund that completion. The pressure of all of these financial circumstances was such as to be very high, for anyone who knew of

14. The last such is convincingly defeated by the two-location breakout and the lack of the presence of large quantities of confined gas-soaked rags or other media.

15. Yes, there is no direct evidence of the specific means by which the two fires were ignited. However, the making of the inference does not and can not turn on that. As a now-deceased dean of federal jurists in this district observed over forty years ago, before *Quast* but very much in sync with its rationale: "To be sure, it is all circumstantial evidence but how often is it possible to prove the actual lighting of the match?" *Klein v. Auto Owners Ins. Co.*, 39 F.R.D. 24, 26 (D.Minn.1965) (Devitt, J.).

16. The efforts in cross-examination to point the blame to another, unidentified person, somewhat in *Perry Mason* fashion, badly misfired.

17. The condition of the back entry door that the first-responding firefighters noted—open but with the knob in locked position—was utterly inconsistent with an entry forced before the fire was set. It was consistent with the door being opened by someone with a key, after the fire broke out, with the locking being the result of accident, panic, or some sort of cockeyed thought of subterfuge.

18. The bar proprietor testified flatly that, throughout the fall, "he didn't seem to have a job," and "was there [at the bar] all the time," during daytime hours.

all of them and who had a stake in the situation.

All told, the Plaintiff has proved that there was a motive to commit arson against this house in late November, 2002.

With findings of incendiary origin at the hands of an insured or another with a stake in the outcome of a fire, and of motivation on the part of such a perpetrator, the Plaintiff made the platform under *Quast* for an inference as to the ultimate fact: an intentional act of arson, on the part of an insured occupant or occupants of the house on the night of the fire, caused this fire. That inference is unchallenged by probative evidence of equal or greater weight, and thus is made.[19]

### 3. Did Defendant Cindy Neumann Perpetrate Fraud on the Plaintiff?

■ As detail-intensive as the process of inference under *Quast* has to be, that fact-finding was the simpler of the two stages of the analysis in this matter. On the record at trial, the determination of knowledge and fraudulent intent on the part of this Defendant, equally a matter of inference,[20] is more involved and problematic, no matter which outcome is to be reached.

In part, this is due to the structure of the defense, which focused very strongly on the arson issue via a dogged denial that it had even taken place. This resistance proved unavailing, and that was entirely foreseeable given the Plaintiff's evidence. Bit by bit, the Plaintiff's case on arson cumulated to great strength, its adequacy and probity unpunctured by the cross-ex-

amination that was the defense's only avenue of response. Ultimately, the defense was left dangling on the arson issue, by its own lack of positive evidence on the historical and technical details of the fire. This left almost no serious fact issues at all.

With so much effort channeled in the evidentiary stage toward an issue that was a loser for the defense, not enough attention was given to supporting a specific theory of fact—a "defense narrative," if you will—that assumed an incident of arson but would cut against the Plaintiff's accusation that the Defendant knew about it all along and fraudulently misrepresented both the event and her awareness. Granted, this would have put the Defendant's counsel into the difficult position of "proving a negative" to rebut the inference that the Plaintiff was urging; but the flow of proof at trial did not readily or easily evidence that negative.

Nonetheless, in his trial brief the Defendant's counsel did raise his client's lack of "culpability" in the act of arson as an alternate line of defense. In his closing argument, he did lay out a version of facts that posited Defendant's lack of knowledge about an incident of arson perpetrated exclusively by her husband, both during the fire and when the application for benefits was submitted to the Plaintiff. The question is whether the preponderance of evidence supports this theory of fact—or whether the Plaintiff's insistence that she could not have possibly *not* known correctly reflects the true events.[21]

Some of the circumstantial evidence that the defense advanced against the Plain-

---

**19.** And, under the Plaintiff's fraud-based theory of this litigation, that is all the more by way of findings that need be made on the matter of individual involvement in any wrongdoing to the Plaintiff, at this point in the analysis.

**20.** *In re Van Horne,* 823 F.2d at 1287; *In re Moen,* 238 B.R. at 791.

**21.** The double-negative in this sentence is deliberate. It seems the best way to carry the thought of the Plaintiff's theory of fact on the fraud issue.

tiff's case on arson does go, equally circumstantially, to the issue of whether the Defendant knew of a planned act of arson, in advance or during its execution. That evidence supports the following findings:

29. When she was single, the Defendant had managed her own financial affairs, maintaining her checking account and paying her debts and expenses as required. About six months after her marriage to John, however, he "took over paying bills and taking care of financial stuff," including the use and balancing of a joint checking account and the handling of all mail that came into the house during the day. The Defendant acquiesced in this, "assum[ing] he was taking care of it," and she "never asked to look at the bank statement."

30. During the several weeks immediately preceding the fire, the Defendant acquiesced in John's use of household funds to purchase more building supplies, ostensibly for the remodeling, and in storing them in the house. These included lumber and drywall board, among other things.

31. In October, 2002, John (at his own initiation) had put bags with an overnight's supply of clothes in the couple's automobile. He did not explain the reason to the Defendant. The Defendant acquiesced in this, without questioning him.

32. The Defendant, on the other hand, did not remove a thing among her personal possessions from the house before the fire. For instance, family albums of hers, with photos of the sons whose custody she had just lost, remained in the house through the fire, some surviving in singed condition.

33. Shortly before the fire, the Defendant made plans for a Thanksgiving dinner, inviting her brother and his girlfriend and using household funds to purchase a turkey and other food that were on the premises during the fire.[22] As of the date of the fire, the Defendant had not gone into the basement for at least a week, and possibly up to a month.

34. On the night of the fire, the Defendant and John had been at home since about 7:30, after having had dinner at the Bellisio's restaurant in Duluth.[23] They spent time watching a movie, using the Jacuzzi bath unit that John had installed in the bathroom, and having one cigarette on the first-floor couch. (They fully extinguished their cigarettes.) They went to bed at 10:30.

35. The Defendant was awakened after 3:00 a.m., when one of the couple's three dogs jumped onto the bed. The Defendant saw smoke curling up the bedroom wall in front of her face.

36. The Defendant then awakened John, who was lying beside her. He ran down the stairs, naked, and then ran around downstairs. The Defendant donned a bathrobe and slippers, went outside to the home of the Abrahamsons next door, and had them call 911. When the Defendant came out of the Abrahamsons' house, John was running around outside in the late November cold, naked.[24] The Defendant

22. The fire occurred two days before Thanksgiving Day, 2002.

23. The check they tendered in payment there was returned NSF shortly after the fire.

24. The outside temperature was then 19 de-

got her jacket from the porch of the house, and retrieved the keys to the couple's automobile that was parked on the street, and threw them to John. From the car, he retrieved and donned a pair of pants (which turned out to be the Defendant's). When he came back to the Defendant barefoot, she threw him his boots from the porch. John then ran to the back of the house. The Defendant did not know what he was doing there. When John returned from the back, his pants and boots bore residue of petrochemicals.[25]

37. By the time the firefighters had arrived, John had lost the keys to the car. Seeing John and the Defendant on the sidewalk, the Abrahamsons took them into their home. Both John and the Defendant appeared upset, the Defendant being especially distraught. Later the Red Cross furnished them with transportation to the AmericInn motel in Cloquet, where they stayed immediately after the fire.

38. The fire resulted in a nearly total loss of property for the Defendant. She was able to salvage the couple of singed photo albums noted earlier.

39. All three of the couple's dogs died in the fire. The Defendant had had deep emotional ties to two of the dogs.[26]

40. The aftermath of the fire, combined with the financial stress that had rapidly mounted right before it, left the Defendant's household devastated. The Defendant "tried paying stuff off" from her post-fire wages, and was able to pay off the past-due balance of about $900.00 on the one VISA charge card account she had maintained under her pre-marital surname. When she could not satisfy the couple's other creditors, the Defendant felt compelled to file for bankruptcy with John.

None of these circumstances is inconsistent with a scenario where John knew what he was going to do—i.e., to set a fire in the house as a prerequisite for a casualty-loss claim on the homeowner's insurance—but nonetheless contrived a role for himself, of the innocent victim of an accidental fire. The several circumstances that support an inference of that scenario are:

41. In 2002, John had two arrest warrants outstanding in states other than Minnesota. The first, issued in California in 1995, was for unlawfully obtaining utility services without paying the full lawful charge (basically, a fraudulent tapping of cable television service). The second, issued in Florida in 1999, was for the offense of "Fraudulent Activities."

42. During the period of less than three years that he knew the De-

---

grees Fahrenheit. There was some snow on the ground in the yard.

**25.** This finding is made on the testimony of the deputy Minnesota fire marshal who investigated at the scene, whose trained dog gave a positive sign for petroleum residue presence when presented with the items. The testing of these items done by the Minnesota Bureau

of Criminal Apprehension came back negative. The on-site testing is found to have been more reliable.

**26.** When questioned about the dogs' status during the fire while she was testifying as an adverse witness in the Plaintiff's case, the Defendant spontaneously cried—in a fashion that was anything but contrived.

fendant, while he was not sustaining regular, longer-term paying employment, John had made no fewer than five claims against property insurers for cash recovery on account of alleged property damage, plus two claims for personal injury in which the tortfeasor against him was indemnified by insurance. The first group was a claim for damage to a truck of his, allegedly caused by a fire. John withdrew this claim before the insurer fully processed it. The second through fourth were the claims for hail and water damage to the house noted earlier, made against the homeowner's insurer that preceded the Plaintiff. The fifth was the claim against the Plaintiff on account of the fire. The two personal injury claims arose out of automobile accidents. The first, on an April, 1999 accident, was settled in July, 2000 when John received approximately $6,500.00. The second, on a February, 2001 accident, was still pending in a pre-litigation stage on the date of the fire, with an October 31, 2002 settlement proposal under consideration. Within several weeks of the date of the fire, this last claim was settled through counsel; in mid-December, 2002, John received just short of $10,000.00.

43. After a six-month period in mid-2002, during which John did nothing about the cancellation of the prior homeowner's coverage, and at a time when he was clearly aware of the household's deep monthly operating deficit, John suddenly undertook to obtain homeowner's coverage on his and the Defendant's account. There is no evidence that the mortgagee was exerting any pressure to get this done, as an alternative to the "forced placement" coverage for its mortgagee's interest in the property that it had obtained.

44. When he applied for the policy, John pushed the agent for casualty coverage for the structure alone with a limit that was 50% greater than the only valuation he had recently received for the house. He had received that valuation ($80,-000.00) from the agent with whom he had discussed a listing in May or June, 2002. The $80,000.00 figure had assumed the completion of all of the remodeling and repair that John had in process then, *and* what he planned and proposed to the agent. The Plaintiff, however, turned down this demand and issued the coverage previously noted in paragraph 3 on p. 3.

45. Given the disordered and partially-dismantled state of the house during the long remodeling process, a less sophisticated person could have believed that investigating officials would be less suspicious that certain aspects of the house's condition were deliberately caused and planned to promote the spread of a fire. Such aspects included the walls opened around wiring and between floors, a clutter of flammable materials in the basement, and petroleum containers present in numbers with some of them open.

46. After the Defendant acquiesced to his control over the couple's limited finances, John was the only one of the two to know of the inevitable: this household, where and as it was constituted, was headed for a financial collapse. The two of them almost certainly were to be forced out of physical possession of the house, and the Defendant deprived

of ownership, by mortgage foreclosure. With knowledge of the household's finances, John would have been aware that a recovery on casualty-loss insurance in the amount of $80,000.00 would at least have left them even in a financial sense, however lacking in a house they would be. He also would have been aware that it could have brought them ahead in liquid cash, by the difference between the mortgage-secured debt and a recovery in any larger amount.[27]

47. In October and November, 2002, John had no employment through a third party, no income from self-employment, and no other source of money in his own right. Yet he was aware that the household desperately needed more income.

48. From his experience in remodeling work, John was acquainted with the internal structural components of houses generally and this one in specific; the conduits that flames originating in a basement would follow upward; and other details that would indicate the likely spread of a fire.

49. Not being versed in the current science of fire investigation however, John likely did not know how sophisticated the process of the detection of origin would be in the case of a fire at the house, via the observations and analysis of fire-fighters, investigators, and expert witnesses alike.

The Plaintiff's response to this is really just a loud insistence that the Defendant simply must have known. The Plaintiff would have that inferred as a matter of ultimate fact, even though there is no direct evidence that she did know. It cites such circumstances as the small size of the house; the close proximity in which the Defendant and John were living together there, with no one else in the household; the alleged likelihood that she was down in the basement soon before the fire, seeing whatever was there; and the improbability that she would not have kept herself apprised of the couple's budget, as the sole gainfully-employed householder, and thus had to have known of the impending financial disaster.

But cutting against this urged inference are several things of significant weight. They include the Defendant's credible denial that she had gone down to the basement for some time.[28] There is her dispirited admission that there had been no particular reason why she had let John "take over the finances," after she had been financially exploited and left with substantial debts by a man in a prior relationship, but nonetheless had done so anyway. And there is the fact that the final custody arrangements for her two sons had not yet been set by the Minnesota state courts, between the guardianship proceeding that involved one and the family-court proceeding that involved the oth-

27. In this scenario—again assuming a recovery of $80,000.00 without considering the practical likelihood of it—the liquid cash would have corresponded to the value of the destroyed construction materials, essentially a forced liquidation of them to the couple's benefit.

28. The Defendant as much as said that there was no reason why she had to go into the basement, other than the time or two she had been helping John "repour the floor," i.e., lay new concrete. There is no evidence that she had done this at any time in close proximity to the date of the fire. And it cannot be denied: the Defendant was working a full-time job; hence she was not around the house most of the time and when she got home she was likely too tired or distracted to do much. John well could have been around the house most of the time, and probably was.

er. On the date the fire broke out, the Defendant wished to fight for custody but was still trying to engage counsel for the custody issues.[29] Given the centrality of a stable home place in judicial considerations on the issue, it is hard to believe that the Defendant would have been actively involved in an effort to destroy her house, or even just knowingly allowing that to go ahead.

The Defendant's demeanor on the witness stand did not detract at all from the credibility of her testimony. A sense that she had great personal shame came through with some of her admissions, and was palpable. The Defendant's demeanor at trial was one of dejection and seeming resignation. Nothing among her appearance, her emotional affect, her reactivity to questions, and the informational content of her responses bespoke guile or deceptiveness in her trial participation.

The seeming irrationality of being a successor-victim of controlling men did not shake the credibility of her testimony's content, either. The Defendant testified that she had divorced John sometime after the fire because he had committed spousal abuse on her.[30] There was no evidence to controvert this; and in context it bears directly on the sense of her previous actions or the external lack of them.

Many aspects of the Defendant's role in this relationship bespeak a sufferer from battered-partner syndrome, who had not undertaken a recovery from that illness. The most prominent are her near-complete cession to John of control over the money she alone was earning, and her utter pas-

sivity in the face of mounting evidence of John's exploitation of her.[31] These factors suggest a different take on the ultimate fact: though she was descending into chaos in her personal life, the Defendant was recognizing very little of the evolving evidence of it, simply not enabling herself to look straight at the whole picture, and definitely not seeing what John was about to do. And if she was engaging in that pattern of avoidance, she was going through a variant of the last experience she had had in a relationship with a man, a return to type that is also consistent with deep-seated codependent victimhood of abuse in a close personal relationship.

So there is enough in the record to support a finding that the Defendant did not push to learn much about what John was doing in the fall of 2002, which bolsters a finding that she did not know what John was really all about. The following circumstances further support the finding that John was putting one over on his wife while he was planning and executing an act of arson:

50. As found earlier, this was an abusive relationship. These relationships are characterized by the abuser's psychological objectification and systemic deception of the abused. They are also characterized by passivity and self-blaming by the abused.

51. Historically, the Defendant was not the only one in the household that John exploited. During the last month of their joint operation of the paper route, September–Octo-

---

**29.** The final disposition on custody was not made until mid–2003.

**30.** The Defendant obtained an Order for Protection against John in October, 2004. The judgment and decree to dissolve their marriage was entered in May, 2005.

**31.** If nothing else, the exploitation lay in her working two jobs week in and week out, while John continued to never quite get a job, to wander through schemes to make money in home-improvement exploits, and to continue fault-finding outside himself in order to file insurance claims that might generate payments of cash in lump sums.

ber, 2002, John stole money from the Defendant's juvenile-age son, by forging checks on the son's personal account. The checks were returned NSF, resulting in an overdraft of more than $3,000.00 on the son's account. For this, John was charged with felony theft and pled guilty to the offense in the Minnesota state courts. He served 47 days in jail and received a stay of execution on the remainder of a sentence to one year and one day of incarceration.

52. Even as he was neglecting to keep the mortgage and auto loan payments current, John kept giving the Defendant blandishments that he was "taking care of it." At least once during the several months before the fire, the lender on the Defendant's auto loan called her to inquire about the lateness of a payment. John's response to her inquiry to him was that he'd "sent it out." He "would get upset" when she asked again about the calls; in response she "would let it go," because she "didn't want to fight with him."

53. John gave the Defendant the same sort of brush-off when, shortly before the fire, the Defendant's wages were garnished at the instance of a collection agency. The garnishor was collecting on a judgment that had been entered against the Defendant in mid-August, 2002, on a delinquent credit-card account un-

der the Defendant's name. At the time of the garnishment, the Defendant was not aware that this judgment had been taken against her.

54. The Defendant did not know about John's failure to keep current on the mortgage, car loan, and credit card payments until after the fire, when she started calling the creditors and was informed about the delinquent status of virtually all of these accounts.[32]

55. In early December, 2002, investigators from the Cloquet Police and Fire Departments started coming to the place where the Defendant and John had moved after the fire to interview them. When this happened, John abruptly left northeastern Minnesota without telling the Defendant where he was going. He left on or about December 9. The Defendant had two telephone conversations with John after December 16. From what he said during them, the Defendant "assumed" that he was "in the Twin Cities," and later she "understood" that he then left for Florida. He returned, shortly before Christmas Day 2002.

56. Entirely to opposite effect, the Defendant stayed and faced up to the music—going through the arson investigation, brooking the possibility of criminal charges against her, and enduring all of the disruption, un-

**32.** In examinations taken by the Plaintiff's counsel before the bankruptcy filing, the Defendant had made statements to the effect that, "to the best of [her] knowledge," she was current on these accounts as of the date of the fire. At trial, she explained the facial inconsistency between these statements and the *actual facts* by saying that she had thought counsel was asking her about the

knowledge she had harbored, *at the time of the fire*, rather than the actuality as she had later discovered it to be. This explanation is not as pat as the Plaintiff's counsel characterizes it, and ultimately it does not defeat the Defendant's credibility. Her testimony at trial did not evidence any great verbal or grammatical sophistication.

certainty, and stress that both entailed.[33] She cooperated with the authorities when John was charged with arson.[34]

57. During December, 2002, after the fire but before John left the area, the Defendant gave John her payroll check (approximately $600.00) and a third-party personal check (around $87.00) and instructed him to deposit them in a credit union account she had opened since the fire.[35] John took the checks, negotiated them for cash and used the money himself. The Defendant did not find out what he had done until a week later, when the credit union contacted her about the account's NSF status, and told her that the deposit that she entrusted to John had not been made.

58. Shortly before Christmas, 2002, the Defendant's employer mailed his employees checks for a Christmas bonus. John took the Defendant's check out of the mail without telling her. The Robertses, with whom the couple were then staying, told the Defendant that they thought they had seen it in arriving mail. When the Defendant asked him, John denied that it had come. The Defendant then found it in a door pocket in John's truck. When she confronted him, he told her, "I just didn't tell you I had it yet."

59. During the spring of 2003, John removed the key to the office of the Defendant's optometrist-employer from her keychain, had it copied, and used the copy to gain entrance to his office. He stole several blank checks from the optometrist, and forged and passed them to obtain money. The Defendant reported the theft to her employer after the checks were negotiated and she noticed the gap in the records for the account. John did all of this despite the obvious jeopardy to the Defendant's employment, which was then the only remaining regular income to their household.[36]

The defense's rejoinder to this is the Defendant's flat denial, both actual and tacit, that she had any advance knowledge of plans on John's part to set the fire, any awareness of the cause while the fire was happening, and any knowledge that John had set the fire when the application for casualty-loss benefits was made to the Plaintiff.[37]

33. And this marked contrast between the Defendant and John, in responsiveness to formal processes and in personal responsibility, carried forward into the litigation of this adversary proceeding. *See supra* at pp. 690–691.

34. The pendency of John's criminal charges delayed the litigation of this adversary proceeding for several months. On June 22, 2005, John pleaded guilty to the charge of negligently causing a fire resulting in damage to property, pursuant to a plea bargain.

35. She had opened this share-draft account after Wells Fargo Bank had closed the couple's checking account earlier in December due to overdrafts.

36. After the theft came to light, however, the Defendant continued to enjoy the trust of her employer. He retained her as an employee and continued to give her very substantial control over all of the finances of his offices in Duluth. He testified at trial to all of these things.

37. In some respects, the Defendant's denial was more tacit and less overt. In her answer, she specifically denied paragraphs X and XI of the Plaintiff's complaint, in which the Plaintiff accused both Defendants of actual participation in arson and fraud in the application for insurance benefits. At trial, no attorney ever directly asked her whether she had been involved in a deliberate burning of the house, or whether she had known the house was deliberately burned when she signed the Sworn Statement. However, in her testimony she did deny knowing about the household's insolvency until after the fire.

In the last instance, this denial is sufficiently direct and the Defendant is credible in making it. On top of the previously-found circumstances, and with the following additional findings, the evidence on the ultimate issue reaches preponderant weight. That preponderance requires the finding that, indeed, the Defendant did not know the actual cause of the fire in an act of arson, at the times when John, she, or both of them applied for benefits from the Plaintiff.

The reasons are as follows. There is no evidence to support a finding that the Defendant actually participated in the planning or execution of the arson. The evidence requires a finding that she did not know of the crisis-pitch of the household finances in October and November, 2002. There is no pointed, probative evidence that the Defendant knew that the couple had no way to finish the remodeling on their own means.[38] Hence, there is no basis for a finding that she would see a claim on the homeowner's insurance as the only possible way of liquidating the value of their interest in the house. Without findings of such knowledge and awareness, a finding of motive cannot be made against the Defendant. The evidence does show that the Defendant had simple physical access to the situs of the set fire, i.e., that she could go down into the basement; but the preponderance of the evidence is that she had not used that access at any point so closely preceding the outbreak of the fire as to be relevant. With this affirmative finding of no actual presence, there is no basis for a finding of "opportunity" on her part.

Then, there is no evidence that John ever admitted a thing to her about any advanced plans for arson and a fraudulent insurance claim, or even discussed the potential benefit of a recovery to them if the house were to be destroyed and the insurance paid off. With all of these holes in the elements of a case for arson, there is no way to make a finding that the Defendant participated in or was complicit with the act of arson that destroyed the house. More to the point of the Plaintiff's case on fraud, there is no basis for a finding that she knew of the intentional setting of the fire before it broke out, or while it was burning.

Going forward in time to the point relevant under § 523(a)(2)(A), the broad pattern of circumstantial evidence, including that going to the nature of this couple's relationship, cuts enough against an inference that she found out after the fact, but before mid-January, 2003, that arson was the source of the fire.

The pattern in the evidence is subtle at first but more apparent as the bulk of circumstances cumulates, and it cuts to the contrary finding. The evidence makes it more likely than not that the Defendant did not know about what John had done, and that she innocently represented her lack of knowledge as to the cause and her lack of involvement in any cause. It seems to have taken the theft of her employer's checks in the spring of 2003, using her as an unwitting dupe, to have finally peeled the scales from her eyes as to what John really was. Only then, and finally, did she have to recognize him as someone who

---

Further, she testified several times that if she had known at any point up to the application for benefits that John had set the fire that had killed her dogs and destroyed her house, she "would have divorced him immediately," and "probably would have turned him in" to the law enforcement authorities. Since she did not take formal legal action affecting the mar-

riage relationship until October, 2004, that can be taken as an affirmative testimonial bolstering of the denials in her answer.

**38.** The Defendant testified that as of the date of the fire she had thought that John had spent $30,000.00 to $40,000.00 already, on materials for the renovation.

would stop at nothing, including arson, to mulct others of money—and who would manipulate and exploit his own wife and jeopardize her well-being to do so.

The evidence, however, cannot support a finding that she knew any earlier than that. Thus, the Defendant cannot be deemed to have been on notice that any claim she made against the Plaintiff on the recitations in the "Sworn Statement" would be false.

As a result, the Plaintiff's case under § 523(a)(2)(A) fails. First, the Plaintiff did not prove that the Defendant knew of the falsity of the representations in question. Second, and *a fortiori*, the evidence can not support a finding that she had an intent to induce the Plaintiff to make payment in reliance on a lie known to her.

The Plaintiff had the burden of production on all elements of its pleaded case for nondischargeability. *In re Scarborough*, 171 F.3d 638, 641 (8th Cir.1999); *First Nat'l Bank of Olathe v. Pontow*, 111 F.3d 604, 608 (8th Cir.1997); *Werner v. Hofmann*, 5 F.3d 1170, 1171 (8th Cir.1993); *In re Belfry*, 862 F.2d 661, 662 (8th Cir.1988); *In re Guske*, 243 B.R. 359, 362 (8th Cir. BAP 2000). Ultimately, it did not carry that burden.[39] The Defendant, therefore, is entitled to judgment under 11 U.S.C. § 523(a)(2)(A).

### B. Plaintiff's Motion to Amend Pleadings (11 U.S.C. § 523(a)(6)) .

■ At the close of evidence, the Plaintiff's counsel made an oral motion for leave to amend its complaint, invoking Fed. R.Civ.P. 15(b), *as incorporated by* Fed. R. Bankr.P. 7015. The amendment would add a count to the Plaintiff's complaint, seeking determination of dischargeability under 11 U.S.C. § 523(a)(6).

In pertinent part, Rule 15(b) provides:

(b) **Amendments to Conform to the Evidence.** When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues.

Section 523(a)(6) creates an exception from discharge for "any debt—... for willful and malicious injury by the debtor to another entity or to the property of another entity ..."

This motion is without merit, for two different reasons.

---

**39.** The emphasis here is on the word "ultimately." The Plaintiff is not to be faulted for carrying this matter to trial. The case law on fact-finding in cases of arson and fraud alike recognizes the difficulties of proof that bedevil plaintiffs in either sort of case. Thus, the law endorses the plaintiff's reliance on circumstantial evidence. More crucially to the bona fides of the Plaintiff's effort here, it saddles the finder of fact with the task of discerning a pattern in that evidence and gauging its strength. The Plaintiff here did not lack a basis to go forward on the backdrop claim of arson; the ruling in its favor certainly bore it out on that point. With the manifest ambiguities of the physical evidence, the lack of eye-witnesses, and even the conundrum of a possible invocation of the spousal privilege to frustrate full latitude in inquiry at trial, the Plaintiff was not out of bounds in what it did: pushing a mass of circumstantial evidence forward, taking its best shot on an urged inference in its favor, and seeking judgment against this defendant. It had enough reason to think that the result could go the other way, for it to seek redress against the Defendant as well as John.

First, the Defendant's counsel never expressly consented to have this different theory of nondischargeability raised as an alternate basis for relief in favor of the Plaintiff. Under the circumstances, that consent cannot be inferred, either, from the way the parties went forward. The reason is that the two issues are so different from each other, in the nature of the proof required and in their abstract essence.

The central issue under § 523(a)(6) is the state of mind that accompanied the creation of a debt; it must be both "willful" and "malicious." Almost three decades' worth of case law under the provision shows how problematic the issue is, both factually and legally; the application of § 523(a)(6) implicates considerations that make the difficulties of analysis under § 523(a)(2)(A) look perfunctory. *See* discussion in *In re Langeslag*, 366 B.R. 51, 57–59 (Bankr.D.Minn.2007). Thus, had the Plaintiff initially pleaded § 523(a)(6), the presentation of evidence, the briefing, and the structure of legal argument would have expanded beyond that actually made, and would have involved very different considerations. The defense presentation would have differed in key respects, had the Plaintiff raised this theory timely and put the Defendant on appropriate notice.

As a result, it is inappropriate to tag the Defendant and her counsel with a consent to a tacit submission of this issue after the fact. Putting them under the onus of defending a new legal theory now, on a closed evidentiary record, would be patently unfair.

■ The other, even stronger reason is that the proposed theory of nondischargeability is simply inapposite. As a matter of logic, the essence of § 523(a)(6) really does not match the acts and transactions at issue here; only § 523(a)(2)(A) does. The act complained of is a *communication* to the Plaintiff. The thought behind the Plaintiff's case is that that communication, a lie, was parlayed to induce the Plaintiff to give up something when it was not legally required to do so. That matches point-to-point to the recognized elements of § 523(a)(2)(A). It does *not* match to the elements of § 523(a)(6). The threshold element of § 523(a)(6) is an "injury to another entity or to the property of another entity," with the statutory intent requirements giving it the nature of an intentional tort. *Kawaauhau v. Geiger*, 523 U.S. 57, 61 and n. 3, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998); *In re Langeslag*, 366 B.R. at 58–59. The Plaintiff has not identified the property belonging to the Plaintiff that would be properly considered as the subject of an injury inflicted by the Defendant.

In oral argument, the Plaintiff's counsel cited two bankruptcy court decisions in which the making of a fraudulent insurance claim was deemed a willful and malicious injury within the scope of § 523(a)(6): *In re Shaw*, 252 B.R. 211 (Bankr.M.D.Fla.2000) and *In re Eunice*, 1993 WL 13005144 (Bankr.S.D.Ga.1993). Frankly, the reasoning of these decisions is a cursory, stretched, and non-illuminating rationalization. An arsonist who sets a fire to his own property to lay the groundwork for a fraudulent insurance claim is injuring his own property in the first instance; his wrong against the insurer lies in the inducement to make payment from monies that an insurance company administers from its reserves. Logically, however, the act of the insurance company parting with the money does not amount to an injury inflicted directly on the insurer's property. The terse tautology underlying these decisions leaves far fewer boundaries on the logical scope of § 523(a)(6), when the more thoughtful recent case law has tried to rein it in toward a more principled and predictable application. *E.g., In re*

*Stage*, 321 B.R. 486, 492–493 (8th Cir. BAP 2005).[40]

Because the legal theory of the proposed amendment lacks merit, there is nothing to be served by granting the motion. It would require a fuller-dress discussion of that lack of merit and another tiresome, but now needless, exposition of the evidence in the record; but ultimately the count would be subject to dismissal under Rule 12(b)(6), for lack of a meritorious supporting legal theory. Thus, the motion must be denied. *In re Senior Cottages of America, LLC*, 482 F.3d 997, 1001 (8th Cir.2007).

### C. Plaintiff's Motion to Supplement Evidentiary Record.

The Plaintiff did not produce John as a witness at trial, under compulsion of subpoena or otherwise. Over three months after the record was closed and this matter was submitted, its counsel electronically filed an *ex parte* motion "for leave to supplement the trial record," with an affidavit he procured from John after John had "made unsolicited contact with [the Plaintiff's] attorney."

■ In making the request, the Plaintiff's counsel acknowledged that the reopening of a closed evidentiary record on a matter still under advisement is committed to the trial court's discretion. He is correct on that. *E.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *In re Harker*, 357 F.3d 846, 849 (8th Cir. 2004).

■ Here, that discretion is *not* appropriately exercised in favor of the Plaintiff. During the long pre-trial pendency of this matter, the Plaintiff had ample opportunity to produce John for deposition or to subpoena him for trial. John had every opportunity to come forward in his own defense on either component of the Plaintiff's case. He did not. (Apparently, the gist of his affidavit is that the Defendant confessed to him in 2004 that she had set the fire. If proven by credible testimony, that could have relieved John of liability on both components.) Even if it had been proffered in a proper format, this submission was far too late to be fairly and squarely received into the record.

In any event, the proffer is not made in a proper format. Receiving the affidavit and considering its content for the adjudication of a central substantive issue would deprive the Defendant of all right to cross-examine John or to present her own testimony in rebuttal. It would be a rank violation of the hearsay rules.

There also is the issue of whether receipt of John's statements is barred by the spousal privilege. In a hastily-filed response, the Defendant's counsel properly raised this issue—which has some real meat on it, as even a second-year law student would recognize. The Plaintiff's counsel did not even acknowledge the privilege issue. This further underlies the impropriety of the submission.

And finally, there is the issue of the credibility of John's late-coming but allegedly strong need to speak out on the issue of who set the fire. Given all else that the evidence showed as to his honesty, values, and scruples, there is none.

### ORDER FOR JUDGMENT

On the findings of fact and conclusions of law set forth in the foregoing memorandum decision,

---

40. The third case that the Plaintiff cited, *In re Edie*, 314 B.R. 6 (Bankr.D.Utah 2004), is factually and legally distinguishable. The debtor in *Edie* set fire to property of her boyfriend, and the boyfriend's insurer pursued her in state court and bankruptcy court *in the status of subrogee.* As such, it succeeded to him on his claim that she had caused an injury to his property. Hence, § 523(a)(6) fit the facts in *Edie.*

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. The Plaintiff's motion for leave to amend its complaint after the close of the evidence is denied.

2. The Plaintiff's *ex parte* motion to supplement the record is denied.

3. The debt of Defendant Cindy Neumann, a/k/a Cindy Whetstone, if any, to the Plaintiff, was not excepted from discharge in BKY 04–51118, by operation of 11 U.S.C. § 523(a)(2)(A), and was discharged in the due course of that case.

LET JUDGMENT BE ENTERED IN ACCORDANCE WITH TERM 3.